CHEROKEE NATION *v.* SOUTHERN KAN. R. CO.

*(District Court, W. D. Arkansas.* February 2, 1888.)

1. **EMINENT DOMAIN—NATURE OF RIGHT.**
   It is the rightful authority which exists in every sovereignty to control and regulate those rights of a public nature which pertain to its citizens in common, and to appropriate and control individual property without the consent of the owners, upon the payment of just compensation to the owner, for the public benefit, as the public safety, necessity, convenience, or welfare may demand.[1]

2. **SAME.**
   Eminent domain pertains alone to sovereignty. It belongs to no other power. It is one of the attributes of sovereignty.

3. **SAME.**
   The right of eminent domain does not grow out of the tenure by which lands are held. When a government asserts the right, it admits title in the one against whom it is asserted. The right of eminent domain exists independent of the consideration whether the lands would escheat to the government in case of a failure of heirs.

4. **SAME—SOVEREIGNTY.**
   By sovereignty, in its largest sense, is meant supreme, absolute, uncontrollable power; the *jus summi imperii;* the absolute right to govern. Sovereignty in government is that public authority which directs or orders what is to be done by each member of society in relation to the end of the association or organization. Government is not sovereignty, but it is the machinery or expedient for expressing the will of the sovereign power.

5. **SAME—RIGHT OF FEDERAL GOVERNMENT.**
   The right to be exercised in a state must be obtained from the state in all cases, except where the federal government seeks to exercise it as being necessary to the enjoyment of the powers conferred upon it by the constitution. In the territories, the right of eminent domain belongs to the federal government.

6. **SAME.**
   The enjoyment of whatever privileges or rights may flow from the power having been exercised, may be granted to another than the sovereign; but when the power will be invoked is to be determined by the agent of the sovereign,—in this case, the congress of the United States, as the agent of the people thereof. Congress can only exercise the right of eminent domain, and cannot grant to another the power of saying when it shall be exercised.

7. **SAME—WHEN EXERCISED.**
   The use of the rights or privileges flowing from the exercise of eminent domain may be granted by the sovereign power to a railroad company, because this is for the public benefit, safety, necessity, convenience, and welfare. This, then, is a proper case for the exercise by congress of this great sovereign right.[1]

---

[1] That the state has no right to take private property for any but a public use, and as to what are such public uses as will justify the exercise of the right of eminent domain, see Johnston's Appeal, (Pa.) 7 Atl. Rep. 167; Heick v. Voight, (Ind.) 11 N. E. Rep. 306, and note; Sholl v. Coal Co., (Ill.) 10 N. E. Rep. 199; In re Railroad Co., (N. Y.) 8 N. E. Rep. 548, and note; Mining Co. v. Dewitt, (Cal.) 15 Pac. Rep. 74.

8. PUBLIC LANDS—INDIAN TITLE—CHEROKEE NATION.

The title to all the lands of the Cherokee Nation was obtained by grant from the United States. This title is a base, qualified, or determinable fee, without the right of reversion, but only the possibility of reversion, in the United States. This, in effect, puts all the estate in the Cherokee Nation.

9. SAME—INDIAN TITLE—CHEROKEE NATION—EMINENT DOMAIN.

Congress cannot grant a right of way over the lands of the Cherokee Nation without its consent, on the ground that the United States has title to such land. If it can do so, it must be done because the government of the United States can exercise, with reference to the lands of the Cherokee Nation, the right of eminent domain.

10. INDIANS—CHEROKEE NATION—STATUS OF.

The Cherokee Nation, while it owns the soil of its country, is under the political control of the United States, and it is dependent on it for its political rights. This, as the history of this country has so often demonstrated, is necessary for the protection of its people.

11. SAME.

The Cherokee Nation is not, therefore, sovereign; for its dependence on the United States forbids the idea of the existence of sovereignty in it, as against the United States. If not sovereign, it cannot, as against the United States, have the right of eminent domain as an inherent right. It cannot have it because it has been granted to it by the government, as the government cannot grant away the sovereign powers of the people.

12. SAME.

The rights of property are defined, and become vested according to the terms of the grant. The right of sovereignty is inalienable, and rests in the discretion of the government, to be exercised without let or hindrance over any part of its territory subject to its political control. In a case where it exists in the government of the United States, every provision of a law or treaty purporting to restrain its full and free exercise by the government would be void.

13. SAME.

The Cherokee Nation is neither a state nor territory in the sense of these words as used in the constitution of the United States. It has a qualified autonomy,—a local government,—but it does not come within the meaning of either a state or territory, but it is a part of what is called "Indian Country."

14. SAME.

Their tribal organization is recognized by the political department of the national government as existing, although their primitive habits and customs are largely broken into by the progress they have made towards civilization. Yet while the intercourse laws enacted by the national government are applicable to them, though they may have a local government of their own, it cannot with any reason be said that, as against the government of the United States, they are a sovereign people, or have the power which is inherent in sovereignty. That they are not sovereign is apparent from the treaties made with them by the United States, from the laws of congress enacted for their government, and from the opinions as to their *status* delivered at different times in the history of the country by the supreme court of the United States.

(*Syllabus by the Court.*)

In Equity.    On bill for injunction.

The bill in this case contains substantially the following allegations:

(1) The plaintiff is a sovereign state, recognized as such by the several treaties with the United States, which are particularly mentioned. (2) Within its territory the plaintiff has the right of eminent domain, as well as all other sovereign attributes. (3) For a valuable consideration, the United States has conveyed and patented said territory to plaintiff in fee-simple. (4) Plaintiff retains the right of sovereignty over all the territory thus patented, save as to certain tracts of land which were re-ceded to the United States by the treaty of 1866, and which are not in question in this suit. (5) On or about the 21st day of October, 1886, the defendant, being a corporation created by

the laws of the state of Kansas, without right, and without authority, consent, or license of the plaintiff, entered the territory of the plaintiff, and commenced to construct a railway through the same. (6) The defendant has built about 10 miles of the road, and intends to build the remainder, to the great damage of the plaintiff. (7) The defendant pretends to have the right to build said road by virtue of an act of congress, approved July 4, 1884, granting the right of way to it through said territory; but the United States had no right to grant said right of way, the territory having been ceded to the plaintiff, as aforesaid. (8) Plaintiff, through its national council, by an act passed December 12, 1884, protested against the building of said railway, and filed a copy of said protest with the secretary of the interior of the United States; and, by an act of the same date, instructed its delegates at Washington to resist the claim of defendant to build or maintain any railway through its territory. (9) On the 14th day of April, 1886, said national council, being by the secretary of the interior of the United States notified of the filing of a map in his department by the defendant, pretending to locate its line of railway through said territory, by act of that date further protested against said location of said railway, or the appropriation of said territory of the plaintiff, without its consent; and further dissented from, and declined to receive as adequate compensation, the sum fixed in said act of July 4, 1884, for the right of way through the Indian Territory. (10) Notwithstanding the said several protests, the defendant still claims to act under color of said act of congress, and has procured to be appointed by the president of the United States certain referees or commissioners, to-wit, M. Galloway, James Brodie, and W. H. Dyer, who have wrongfully undertaken to appraise the rights of plaintiff in the lands and territory embraced by the line of said location filed by defendant in the department of the interior aforesaid; and have pretended to award to the plaintiff therefor the sum of $3,301.50 for the lands embraced in the main line, and $4,051.44 for the lands embraced in the branch lines, of the defendant. (11) On the 29th day of October, 1886, the acting commissioner of Indian affairs, by a communication of that date, informed the plaintiff, through its principal chief, of said pretended finding and award of said pretended referees or commissioners. (12) Thereupon the plaintiff, by its national council, on the 17th day of December, 1886, by an act of that date, further protested against the assumed grant of the right of way, and dissented from the said award as being entirely inadequate; and on the same day the plaintiff, without waiving any of its rights, appealed to this court from said award, and from all the proceedings had under said act, and requested the secretary of the interior to transmit a transcript of said award, and of all other proceedings had under said act of congress. (13) Without admitting the authority of the said referees to act in the premises, their award is wholly inadequate, as said right of way is reasonably worth $500 a mile; and plaintiff protests against said inadequacy, as well as against the power of said referees, and prays that this complaint may be treated as an original complaint and petition on appeal from said award, as provided by section 3 of said act of congress. (14) The defendant will continue to build its road through said territory, unless restrained by the court. (15) By section 8 of said act of congress, jurisdiction of all contests between said plaintiff and said defendant is bestowed on this court, and all of said proceedings have been returned into this court by said secretary of the interior.

The prayer of the bill is:

(1) That defendant be required to answer the bill; (2) that the award be set aside; (3) that defendant be restrained from building or operating a railway, telegraph, or telephone line through its territory, and that an injunction be enforced during the pendency of this suit; (4) that, in case the court shall

not issue said injunction, the plaintiff be awarded adequate compensation for the lands proposed to be taken for the right of way, and for the rights, easements, and franchises proposed to be granted to the defendant; (5) and for all other proper relief.

The purport of the act of congress thus referred to may be sufficiently shown by the following abstract of the same:

Section 1 gives to the defendant the right to locate, construct, equip, and operate a railway, telegraph, and telephone line through the Indian Territory, on a certain route therein described.

Section 2 prescribes the width of the right of way of the railway company.

"Section 3. That before said railway shall be constructed through any lands held by individual occupants, according to the laws, customs, and usages of any of the Indian nations or tribes through which it may be constructed, full compensation shall be made to such occupants for all property to be taken or damage done by reason of the construction of said railway. In case of failure to make amicable settlement with any occupant, such compensation shall be determined by the appraisement of three disinterested referees, to be appointed by the president, who, before entering upon the duties of their appointment, shall take and subscribe, before competent authority, an oath that they will faithfully and impartially discharge the duties of their appointment; which oath, duly certified, shall be returned with their award. In case the referees cannot agree, then any two of them are authorized to make the award. Either party, being dissatisfied with the finding of the referees, shall have the right within ninety days after the making of the award, and notice of the same, to appeal by original petition to the courts, where the case shall be tried *de novo*. When proceedings have been commenced in court, the railway shall pay double the amount of the award into court to abide the judgment thereof, and shall have the right to enter upon the property sought to be condemned, and proceed with the construction of the railroad. Each of the referees shall receive for their [his] services the sum of four dollars per day for each day they are [he is] engaged in the trial of any case submitted to them under this act, with mileage at five cents per mile. Witnesses shall receive the usual fees allowed by the courts of said nation. Costs, including compensation of the referees, shall be made a part of the award, and be paid by said railroad company."

Section 4. This section relates to the rates and charges of the railway company.

"Section 5. That said railway company shall pay to the secretary of the interior, for the benefit of the particular nations or tribes through whose lands said main line and branch may be located, the sum of fifty dollars, in addition to compensation provided for in this act, for property taken and damage done by the construction of the railway, for each mile of railway that it may construct in said territory; said payments to be made in installments of five hundred dollars as each ten miles of road is graded. Said company shall also pay, so long as said territory is owned and occupied by the Indians, to the secretary of the interior, the sum of fifteen dollars per annum for each mile of railway that it may construct in said territory. The money paid to the secretary of the interior, under the provisions of this act, shall be apportioned by him, in accordance with the laws and treaties now in force among the different nations and tribes, according to the number of miles of railway that may be constructed by said railway company. That congress shall have the right, so long as said lands are occupied and possessed by said nations and tribes, to impose such additional taxes on said railroad as it may deem just and proper for their benefit: provided, further, that if the general council of either of the nations or tribes through whose lands said railway may be located shall,

within four months after the filing of maps of definite location, as set forth in section six of this act, dissent from the allowance provided for in this section, and shall certify the same to the secretary of the interior, then all compensation to be paid to such dissenting nation or tribe under the provisions of this act shall be determined as provided in section three for the determination of the compensation to be paid to the individual occupant of lands, *with the right of appeal to the courts upon the same terms, conditions, and requirements as therein provided:* provided, further, that the amount awarded or adjudged to be paid by said railway company for said dissenting nation or tribe shall be in lieu of the compensation that said nation or tribe would be entitled to receive under the provisions of this section. Nothing in this act shall be construed to prohibit congress from imposing taxes upon said railway, nor any territory or state, hereafter formed, through which said railway shall have been established, from exercising the like power as to such part of said railway as may lie within its limits. Said railway company shall have the right to survey and locate its railway immediately after the passage of this act."

Section 6 provides for filing maps of surveys in the office of the secretary of the interior, and in the offices of the principal chiefs of the tribes. The company is to commence grading its line of road within six months after its location.

Section 7 gives the right to the officers and servants of the company to reside on the right of way.

Section 8 gives jurisdiction of all controversies between any of the tribes and the company to the United States district court for the Northern district of Texas, to this court, and to the district court of Kansas, without regard to the amount in controversy.

Section 9 fixes the time and manner of constructing the road.

Section 10 prohibits the company from all efforts to extinguish the title of the Indians to their other lands.

Section 11 provides that all mortgages executed by the company on any of its lands and franchises in the Indian Territory shall be recorded in the department of the interior.

"Section 12. Congress may at any time add to, alter, or repeal this act."

Defendant demurs—*First,* for want of jurisdiction; *second,* for want of equity; *third,* because the suit is one that attempts to join legal and equitable causes of action.

*McDonald, Bright & Fay* and *E. C. Budinot,* for plaintiff.

*U. M. & G. B. Rose,* for defendant.

PARKER, J., (*after stating the facts as above.*) The controlling question in this case is, did the congress of the United States have the right to grant to defendant a right of way for its railroad across or over the land of the Cherokee Nation, the defendant paying the nation for the same, and the individual occupants for their improvements? If congress had that right, the court has jurisdiction, and that would dispose of the first ground of demurrer. The determination of this question settles the second ground; for, if congress has the right to grant the right of way to defendant upon its paying for the same, there is no equity in the bill of the plaintiff. If it does not have the right to make the grant, then either the whole act would be void, or so much of it as to leave nothing to which the valid part is applicable; and this cause of demurrer, in such case, would be unnecessary, as the case would be decided on the first

ground.  Congress can only have this right, either because the title of this real estate is in the United States, or because the government of the United States can exercise what is called the "right of eminent domain," and take the property, or authorize a railroad to take it, on its paying just compensation to the owners, by the exercise of the power growing out of this right.  This court held in *U. S.* v. *Reese*, 5 Dill. 405, and in *U. S.* v. *Rogers*, 23 Fed. Rep. 658, that the title to the lands of the Cherokees was obtained from the United States by grant.  This title is a base, qualified, or determinable fee, without right of reversion. but only the possibility of reversion, in the United States.  This, in effect, puts all the estate in the Cherokee Nation.  This is in substance the principle declared by the supreme court of the United States in *Holden* v. *Joy*, 17 Wall. 211.  Congress could not, therefore, without the consent of the Cherokee Nation, and individual occupants of its land, grant to defendant this right of way because the United States had title to the land, or because it was either a part of the public domain, or a reservation belonging to the government.  If it can be done at all, it must be because the government of the United States can exercise, with reference to the lands of the Cherokee Nation, the right of eminent domain.  If the government does not have this right, then the act of congress purporting to grant the right of way is void, because of the absence of constitutional power to pass it.  To ascertain the existence or non-existence of the right in the government—to ascertain whether it is there, or in the Cherokee Nation—requires that we should see what is meant by the right of eminent domain.  Then we must look to the political *status* of the Cherokee Nation, and see what are its political relations to the government of the United States.

Eminent domain is generally defined as "that superior dominion of sovereign power over all the property within the state, including that previously granted by itself, which authorizes it to appropriate any part" thereof necessary to public use; reasonable compensation being made.  In *Boom Co.* v. *Patterson*, 98 U. S. 406, the right is tersely defined to be "the right to take private property for public use."  Mr. Cooley, in Constitutional Limitations, (pages 523, 524,) says eminent domain "is the rightful authority which exists in every sovereignty to control and regulate those rights of a public nature which pertain to its citizens in common, and to appropriate and control individual property for the public benefit, as the public safety, necessity, convenience, or welfare may demand."  Again, at the same page, when speaking of eminent domain in reference to those cases in which the government is called upon to appropriate property against the will of the owners, he says: "It may be defined to be that superior right of property pertaining to sovereignty by which the private property acquired by its citizens, under its protection, may be taken, or its use controlled, for the public benefit, without regard to the wishes of its owners."  We see by these definitions that this right of eminent domain is one which pertains alone to sovereignty.  It belongs to no other power than sovereign power.  It is one of the attributes of sovereignty.  Therefore, if we can find what sovereignty means, and

can ascertain what is the political *status* of the Cherokee Nation, when considered with reference to the government of the United States, we can see where resides this chief attribute of sovereignty called "eminent domain." Vattel, in his Law of Nations, (book 1, page 1,) says: "From the very design that induces a number of men to form a society which has its common interests, and which is to act in concert, it is necessary that there should be established a public authority to order and direct what is to be done by each in relation to the end of the association. This political authority is the sovereignty, and he and they who are invested with it are the sovereign. Sovereignty in government may then be defined to be that public authority which directs or orders what is to be done by each member associated, in relation to the end of the association." It may be remarked, with us, the body of the nation has kept in its own hands the empire, or the right to command, and our government is therefore called a "popular government." Wheaton defines sovereignty, "the supreme power by which any citizen is governed." Hurd says: "The supreme power in the state must necessarily be absolute, in being subject to no judge." Jameson says: "By the term 'sovereignty' is meant the person or body of persons in a state to whom there is politically no superior." Leiber has said: "The necessary existence of the state, and that right and power which necessarily follow, is sovereignty." Story says: "By sovereignty, in its largest sense, is meant supreme, absolute, uncontrollable power; the *jus summi imperii;* the absolute right to govern." Yeaman, in his Study of Government, (484,) says: "This sovereignty is the last and supreme will in the direction and control of the affairs of society, and beyond or above which there is no political power, and no legal appeal. The word which by itself comes nearest being the definition of sovereignty is will or volition, as applied to political affairs. Government is not sovereignty. Government is the machinery or expedient for expressing the will of the sovereign power." Definitions of sovereignty might be almost indefinitely multiplied, but these which have been given I believe to be sufficient to give an accurate idea of its nature. This sovereign power in our government belongs to the people, and the government of the United States and the governments of the several states are but the machinery for expounding or expressing the will of the sovereign power.

Eminent domain is said to be such an inherent and essential element of sovereignty that it results from the social compact, and hence would exist without any express provision of the organic law on the subject. *Brown* v. *Beatty,* 69 Amer. Dec. 389; *Moale* v. *City of Baltimore,* 61 Amer. Dec. 278; *Alexander* v. *Mayor,* 46 Amer. Dec. 630. The right of eminent domain is a right distinguished from, and paramount to, ultimate ownership. *Kohl* v. *U. S.,* 91 U. S. 371. The right of eminent domain does not grow out of the tenure by which lands are held. *Kohl* v. *U. S., supra.* In effect, when the government asserts the right of eminent domain, it admits that the title is in the one against whom the right is asserted. If the government has the title, it simply donates its own real property, existing as public domain, or as government reservations. This is not

the assertion of eminent domain, but an appropriation by the government of that property to which it has a title. When the government takes property by right of eminent domain, it takes it by an assertion of a sovereign right, and does not take it by reason of the title being in it. In the *Case of Kohl, supra,* the supreme court says:

"This right exists independent of the consideration whether the lands would escheat to the government in case of the failure of heirs. The right is the offspring of political necessity, and is one inseparable from sovereignty, unless denied to it by the fundamental law."

The Cherokee Nation, while it owns the soil of its country, is under either the political control of the United States, or of the states of this Union; for under this government, as was said by Mr. Justice MILLER, in *U. S. v. Kagama,* 118 U. S. 379, 6 Sup. Ct. Rep. 1109, "there exists within the broad domain of sovereignty but these two." Since the cases of *Cherokee Nation v. Georgia,* 5 Pet. 1, and *Worcester v. State of Georgia,* 6 Pet. 515, we have known that the Cherokee Indians were not under the political control of the states. Therefore they must be under the political control of the government of the United States; for, certainly, it cannot be asserted that this community of people are possessed of such political power that they are not subject to the sovereign will of the United States. Mr. Justice TANEY, in *U. S. v. Rogers,* 4 How. 572, said:

"We think it too clearly and firmly established to admit of dispute that the Indian tribes residing within the territorial limits of the United States are subject to their authority."

In *U. S. v. Kagama, supra,* Mr. Justice MILLER, speaking for the court, in language of a general character says:

"These Indian tribes are the wards of the nation. They are communities dependent on the United States; * * * dependent for their political rights."

Again, at the same page:

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection. * * * It must exist in that government, because it never has existed anywhere else; because the theater of its existence is within the geographical limits of the United States; because it never has been denied; and because it alone can enforce its laws on all the tribes."

The political *status* of the Choctaw Nation of Indians, as far as its relation to the United States is concerned, is precisely like that of the Cherokees. In the case of *Choctaw Nation v. U. S.,* 119 U. S. 28, 7 Sup. Ct. Rep. 75, the court, when speaking of the *status* of that nation, said:

"The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care of the former, and which, while it authorizes the adoption on the part of the United States of some such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of the acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection."

Chief Justice MARSHALL, in *Cherokee Nation v. Georgia,* 5 Pet. 1, used this language:

"It may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may more correctly, perhaps, be denominated ' domestic dependent nations.'  *  *  *  They are in a state of pupilage. Their relations to the United States resemble that of a ward to his guardian. They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their ' Great Father.' They and their country are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States that any attempt to acquire their lands, or to form a political connection with them, would be considered by all as an invasion of our territory, and as an act of hostility."

If they are a dependent nation, upon whom are they dependent? Not upon the states, but upon the United States. This dependence is a political one, and its very existence implies political control in some other power than their government. The existence of this dependence and political control forbids the existence of sovereignty in their nation. The non-existence of sovereignty forbids the existence as an inherent right of eminent domain. Then the Cherokees could not possess the right of eminent demain as an inherent principle of their government. It cannot exist except inherently, from the nature of the power in government, or by grant from some sovereign power. But it must be remembered, under our government, all sovereign power is lodged in the people; and the government, by its different departments, can exercise only such power as has been delegated to it by the people. None of these delegated powers can be by the government delegated to some one else. They are only granted to the government to be in proper cases exercised by it, and not to be given to another to be exercised by that other. It is well, in this connection, to note the distinction between the rights of property and the right of sovereignty. The first are defined, and become vested according to the terms of the grant; the second is inalienable, and rests in the discretion of the government to be exercised without let or hinderance over any part of its territory. In a case where it exists in the government of the United States, every provision of a law or treaty purporting to restrain its full and free exercise by the government would be void. In my judgment, the law-making power of the country has no such right conferred upon it by the people of this nation as to enable it to carve out from the midst of the public domain a portion of territory which shall be exempt from its governmental control, when that territory is in such a political condition as to be neither a state nor territory, according to the constitutional meaning of these words. The right to grant away or delegate the sovereign power of the nation has never for a moment been conceded, as respects a foreign state, to the president, by and with the consent of the senate, as within the treaty-making power; nor can it be claimed to be within the power of congress. If, from our system of government, it is not in either, how can it be claimed as belonging to the Indian tribes? There can be no doubt that the general sovereignty of the government which, for public reasons and the public good, is exercised over the persons and property of

the nation, is a power wholly distinct and separate from that which deals with adverse claims of title to real and personal property. The one attaches to the soil and people as an inalienable attribute, inherent in the very nature of the government. The other is a mere question of vested rights, dependent upon the true construction of the instruments of title under the constitution and laws. Mr. Cooley, in Constitutional Limitations, (524,) says:

"When the existence of a particular power in the government is recognized on the ground of necessity, no delegation of the legislative power by the people can be held to vest authority in the department which holds it in trust to bargain away such power, or to so tie up the hands of the government as to preclude its repeated exercise, as often and under such circumstances as the needs of the government may require. For, if this were otherwise, the authority to make laws for the government and welfare of the state may be so exercised, in strict conformity with its constitution, as at length to preclude the state performing its ordinary and essential functions, and the agent chosen to govern the state might put an end to the state itself. It must follow that any legislative bargain in restraint of the complete, continuous, and repeated exercise of the right of eminent domain is unwarranted and void."

I think the political *status* of the Cherokee Nation has been shown with sufficient clearness by reference to the opinions of the supreme court of the United States, delivered at different times in the history of this people and this government. These opinions, as expressions in regard to their condition of political dependence on the United States, do not need anything to give them clearness or strength, but, if they did, it can be found in different treaties heretofore made with these people, and in the laws enacted for the government of their country at different times by the congress of the United States. On the 28th of November, 1785, the United States made the first treaty with the Cherokees. By it they acknowledged "that all the Cherokees were under the protection of the United States, and no other sovereign whatever." The ninth article provided that for the benefit and comfort of the Indians, and for the prevention of injuries or oppressions on the part of the citizens to Indians, the United States should "have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs in such manner as they think proper." On the 2d of July, 1791, another treaty was made with them. In the second article of this treaty they said: "The undersigned chiefs and warriors, for themselves and all parts of the Cherokee Nation, do acknowledge themselves and the said Cherokee Nation to be under the protection of the United States of America, and of no other sovereign whatsoever." Here, when relations were first established with them by the United States, we find in the very first treaty ever made with them that they placed themselves under the protection of the United States; admitting that they were their sovereign, to which they looked for security and protection. It must be remembered that they have remained under that protection to this time. Again, in the fifth article of the treaty of May 23, 1836, we find them looking to their sovereign to give them a right to enact certain local legislation. This article, among other things, provides the United States "shall secure to

the Cherokee Nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country. * * *" Here we find the origin of their local government as the same is recognized by the sovereign,—the government of the United States,—and we find it emanating directly from that government. By the twelfth article of the treaty of July 10, 1866, the Cherokee Nation agreed that a general council should be held, to be made up of delegates of the different tribes or nations lawfully residing within the Indian Territory. By the provisions of this article of the treaty, there was to be called into existence a law-making power for the whole of the Indian country belonging to the five civilized tribes, and other Indians lawfully in the country, somewhat similar to our territorial governments. The council was to be convened under the direction of the commissioner of Indian affairs. It was to be presided over by such person as the secretary of the interior should designate. It was to have a secretary, who was to keep an accurate record of its proceedings, and transmit a duly-certified copy thereof to the secretary of the interior. The members of the council and secretary were to be paid by the United States. It enumerated the legislative power of the council, and provided that such power might be enlarged by the consent of the national council of each nation or tribe assenting to its establishment, and with the approval of the president of the United States; and finally it provided that all laws enacted by such council shall take effect at such time as may therein be provided, *unless suspended by direction of the president of the United States.* The claim that people situated as indicated by this article of the treaty of 1866, as against the government of the United States, are a sovereign people, is to my mind little less than absurd.

Unless the right to exercise the powers of local government is of such nature as to give to the Cherokee Nation the character of a state in this Union, there is not conferred on it the right of eminent domain, as this great right, attendant upon sovereignty, belongs, in this country, either to the federal government or the government of the states. Under our dual system of government before the original colonial states entered the Federal Union, this right of eminent domain belonged to them, and when they entered the Union they retained the right to protect and regulate private rights, privileges, and immunities in general. Because this right was retained as one of the powers of the state governments, and because, under our political organization, it was expected that these governments would make provision for those conveniences and necessities which are usually provided for the citizens through the exercise of eminent domain, the right itself, when sought to be exercised in a state, must be obtained from the state in all cases, except where the government of the United States seeks to exercise the right for its own purposes, as in a case where it desires a site for a court-house, custom-house, post-office, arsenal, dock-yard, navy-yard, or any other purpose of the government. In such case the right of eminent domain is in the federal government in every case, and may be exercised by it in the states

so far as is necessary to the enjoyment of the powers conferred upon it by the constitution. *Kohl* v. *U. S.*, 91 U. S. 367; *Trombly* v. *Humphrey*, 23 Mich. 471; *Dickey* v. *Turnpike Co.*, 7 Dana, 113; *McCulloch* v. *Maryland*, 4 Wheat. 429; Cooley, Const. Lim. 526. This right was retained, with the above exception, by the original 13 states when they came into the Union. The new states have been admitted into the Union on the same footing as the original 13. Thus they have this right of eminent domain. I think it very clear that in the territories the right of eminent domain belongs to the federal government alone, because of their dependence upon that government, and because of the fact of their having no sovereign power. Mr. Cooley, in Constitutional Limitations, (525,) says:

"In the new territories, however, where the government of the United States exercises sovereign authority, it possesses, as an incident thereto, the right of eminent domain, which it may exercise directly, or through the territorial governments; but this right passes from the nation to the newly-formed state whenever the latter is admitted into the Union."

This court held in *Ex parte Morgan*, 20 Fed. Rep. 298, that the Cherokee Nation is neither a state nor territory, in the sense of these words as used in the constitution of the United States. It has a qualified autonomy,—a local government,—but it does not come within the meaning of either a state or territory, but is a part of what is called "Indian Country." If this be true, it is subject to the statutes of the United States, which make up what is called the "Intercourse Law," regulating the intercourse of the government and people of the United States with the Indian tribes. The construction of every provision of this law is against the idea of the sovereignty of the Cherokee Nation. The importance of the question involved will warrant a reference to a few leading sections of this law as it now exists. We find from the year 1800 the congress of the nation has legislated in regard to the government of the Indian country. By the act of June 30, 1834, there was a consolidation of many of the former provisions passed since the year 1800. Others were altered by this last act, so that by the act of 1834 there was established a new Indian Code. This Code was amended by the act of March 3, 1847. All of this legislation was amended and re-enacted in the shape in which it now exists by the revision of the laws of the United States in 1873; and the law on the subject is found in Rev. St. U. S. c. 3, p. 369, and Id. c. 4, p. 371. Section 2114 provides: "The president is authorized to exercise general superintendence and care over any tribe or nation which was removed upon an exchange of territory, under authority of the act of May 28, 1830, 'to provide for an exchange of lands with the Indians residing in any of the states or territories, and for their removal west of the Mississippi, and to cause such a nation to be protected at their new residence against all interruption or disturbance from any other tribe or nation of Indians, or from any other person or persons.'" The Cherokee tribe or nation was removed from its home east of the Mississippi river to its present home, by authority of this act of May 28, 1830. The Cherokees are still under the control of an Indian agent

appointed by the president, and confirmed by the senate. Section 2058, Rev. St., provides that this agent " * * * shall superintend the intercourse with the Indians agreeably to law, and execute and perform such regulations and duties, not inconsistent with law, as may be prescribed by the president, the secretary of the interior, the commissioner of Indian affairs, or the superintendent of Indian affairs." Under section 2103, Rev. St., "no agreement shall be made by any person with any tribe of Indians, or individual Indian, not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him or any other person, in consideration of services for said Indians, relative to their lands, or to any claims growing out of or in reference to annuities, installments, or other moneys, claims, demands, or thing under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States," unless such contract or agreement be executed and approved as provided by a subsequent part of the section. This provides the contract shall be executed before a judge of a court of record, and bear the approval of the secretary of the interior and the commissioner of Indian affairs indorsed on it. By section 2106, Rev. St., "no assignment of any contracts embraced in section 2103, or any part of one, shall be valid, unless the names of the assignees, and their residences and occupations, be entered in writing on the contract, and the consent of the secretary of the interior and the commissioner of Indian affairs to such assignment be also indorsed thereon." Section 2116 provides that "no purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be valid, in law or equity, unless the same be made by treaty or convention entered into pursuant to the constitution. * * *" Section 2117 is that "every person who drives or otherwise conveys any stock or horses, mules, or cattle to range and feed on any lands belonging to any Indian or Indian tribe, without the consent of such tribe, is liable to a penalty of one dollar for each animal of such stock." The statute further provides that the agent of each tribe of Indians is authorized, for the benefit of the Indians, to sell any cattle, horses, or other live-stock belonging to the Indians, under such regulations as shall be prescribed by the secretary of the interior; that a person, before he shall be permitted to trade with any Indian tribe, is by section 2128 required to give bond to the United States. By section 2132, the president is authorized, whenever in his opinion the public interest may require the same, to prohibit the introduction of goods, or of any particular article, into the country belonging to any Indian tribe, and to direct all licenses to trade with such tribe to be revoked. * * *" Section 2137 contains a prohibition against hunting in the Indian country. Section 2138 is: "Every person who drives or removes, except by authority of an order lawfully issued by the secretary of war, * * * any cattle, horses, or other stock from the Indian Territory, for the purpose of trade or commerce, shall be punishable," etc. Section 2139 provides that no ardent spirits shall be introduced into the Indian coun-

try. Section 2145 extends the criminal laws of the United States over the Indian country, except as to crimes committed by one Indian upon another. Section 2147 gives the Indian agents and subagents the right to remove all persons from the Indian country who are in there contrary to law. By section 2071 the president may, in his discretion, employ persons to teach Indians in agriculture, and their children in the ordinary branches of science. All of these provisions of law are applicable to the Cherokee Nation. They are under an agent. Their tribal organization is recognized by the political department of the national government as existing. Although the primitive habits and customs of these people have been largely broken into by the progress they have made towards civilization, yet while these laws enacted by the national government are applicable to them, though they may have a local government of their own, it cannot with any reason be said that, as against the government of the United states, they are a sovereign people, or have the power which is inherent in sovereignty. That their qualified autonomy does not give them sovereignty is apparent from the treaties with them, from the laws enacted by the political department of the government of the United States for their government, and from the opinions delivered at different times by the supreme court of the United States.

We are called on to consider their political relation to the United States, and whether their *status* is such as that they possess sovereign power, as against the United States. If they do not have this sovereign power they cannot inherently have the right of eminent domain, because it is an incident of sovereignty only. But it may be asked, if they do not have it inherently, from the nature of their government, can they not have it by grant from the United States, and thus, to this extent, become sovereign? This is a sovereign power, which, as we have seen, cannot be delegated. The enjoyment of whatever privileges or rights may flow from the power of eminent domain, being exercised, may be granted to another than the sovereign; but when the power will be invoked is to be determined by the agent of the sovereign,—in this case, the congress of the United States, as the agent of the people. This principle being correct, it must be held that any claims that the treaty-making power or congress may have granted the right of eminent domain to the Cherokee Nation, and, in this respect, conferred on it sovereign power, are without foundation; because neither congress nor the treaty-making power can grant away the sovereign powers of the government, but they can only exercise them for the people to whom they belong. Then we must conclude that the right of eminent domain as to the Cherokee Nation, although that Nation has the title to its lands, is not in it, because its *status* or relation to the government of the United States is that of a subordinate to a sovereign, and that sovereign is the United States, in which resides the right of eminent domain, when that right is to be invoked in the Cherokee Nation. We have found that the right of eminent domain gives the right to appropriate and control individual property, on payment of a just compensation, for the public benefit, as the public safety, necessity, convenience, or welfare may demand.

Is the building of defendant's railroad a public convenience? Does it promote the public welfare? Is it a public benefit? If so, congress may exercise the right of eminent domain by passing a law permitting defendant company to use the fruits flowing from the exercise of the right of eminent domain by congress, to enable it to build its road. Whatever builds up or promotes interstate commerce must be regarded as increasing the public benefit, by enhancing its convenience, its comfort, and its general welfare. This, then, would be a proper case for the exercise by congress of this great sovereign right; and it has been frequently so held by the courts, as in *Boom Co.* v. *Patterson*, 98 U. S. 406; *Secombe* v. *Railroad Co.*, 23 Wall. 108; *Brown* v. *Beatty*, 69 Amer. Dec. 392; *Railroad Co.* v. *Applegate*, 33 Amer. Dec. 497. It was held in *Secombe* v. *Railroad Co., supra:* "If a public interest is to be subserved which demands the taking of private property, the taking of such property for such purpose is a public necessity. The taking of private property in order that a railroad may be constructed, is taking to subserve a public interest, and it is therefore taking it to meet the demands of public necessity." The same principle is held with equal force in *Railroad Co.* v. *Applegate, supra.* Congress, then, used this attribute of sovereignty in a proper case, when it permitted the defendant company, not to say when eminent domain should be exercised, but, as the agent of the public, to use the fruits or effects of the exercise of the right as a means of constructing its road, to promote the public interest. This view of the case leaves the bill without equity; so that the injunction must be refused, and the bill dismissed, unless the court can retain jurisdiction of it to try the question of damages, as it is asked to do by one of the prayers of the bill.

This is a suit in equity. The method of recovering damages under the law of congress of July 4, 1884, granting the right of way over the lands of the Cherokee Nation, is a proceeding at law. "Whenever a statute grants a new right, or a new remedy for the violation of an old right, or whenever such rights and remedies are dependent on state statutes or an act of congress, the jurisdiction, as between the law side and the equity side of the federal courts, must be determined by the essential character of the case. Unless it comes within some of the heads of equitable jurisdiction, the remedy of the party is at law." *Van Norden* v. *Morton*, 99 U. S. 378. There is an adequate remedy at law to recover the damages for right of way. It is obtained in this case by filing an original complaint on the law side of the court, praying for an assessment of damages. Legal and equitable causes of action cannot be joined in the federal courts. *Hunt* v. *Hollingsworth*, 100 U. S. 100. The plaintiff, having a plain and adequate remedy at law, cannot in a federal court join this remedy with one in equity. The bill seeks alternative relief, and the plaintiff's counsel claim they have a right to so plead. If the relief asked in the alternative is wholly equitable relief, the prayer in a suit in equity may be in the alternative; but if the relief asked is both equitable and legal, and the prayer is for equitable relief, or if the court cannot grant this relief then for legal relief, this legal relief cannot be granted unless it is incident to, and grows out of, the equitable action of which the

court has jurisdiction. But there is no cause for an equitable action here. The bill fails, and there is nothing left but the legal right for the recovery of damages, which must, under the federal practice, be asserted in a court of law, and it cannot be joined with an equitable cause of action, and, if it fails, then be asserted in the same suit as a legal remedy. This is now a rule beyond question in the federal courts. *Buzard* v. *Houston*, 119 U. S. 347, 7 Sup. Ct. Rep. 249; *Kramer* v. *Cohn*, 119 U. S. 355, 7 Sup. Ct. Rep. 277; *Dowell* v. *Mitchell*, 105 U. S. 430; *Hunt* v. *Hollingsworth*, *supra*.

The demurrer to the bill must be sustained, injunction refused, and the bill dismissed, without prejudice.