[Civil No. 3831.   Filed April 25, 1938.]

[78 Pac. (2d) 982.]

CITY OF BISBEE, a Municipal Corporation, Appellant, v. COCHISE COUNTY, DANIEL S. KITCHEL, as Treasurer and ex-Officio Tax Collector of Cochise County, and JOHN HILD, HARLIE COX and JOHN MURPHY, as the Board of Supervisors of Cochise County, Appellees.

Mr. James T. Gentry, City Attorney of Bisbee, and Mr. W. G. Gilmore, for Appellant.

Mr. Frank E. Thomas, County Attorney, for Appellees.

Messrs. Silverthorne & Van Spanckeren, Messrs. Moore & Romley, Messrs. Strouss & Salmon, Mr. Frank L. Snell, Mr. Blaine B. Shimmel, Messrs. Baker & Whitney, Mr. Lawrence L. Howe, Mr. Floyd M. Stahl, Mr. Herman Lewkowitz, Messrs. Gust, Rosenfeld, Divelbess, Robinette & Coolidge, Messrs. Armstrong, Kramer, Morrison & Roche, Messrs. Moeur & Moeur, Messrs. Darnell, Pattee & Robertson, Mr. Chester H. Smith, Messrs. Wilson, Wood & Compton, Mr. Dodd L. Greer, and Mr. Gilbert E. Greer, *Amici Curiae.*

LOCKWOOD, J.—In this case the City of Bisbee, a municipal corporation, hereinafter called plaintiff, brought suit against the County of Cochise and others, hereinafter called defendants, to recover certain tax moneys belonging to the plaintiff, which it was alleged the defendants had collected and refused to pay to the owner. The facts were not denied, but a number of legal objections to the recovery were raised by the defendants, and we held that none of the matters so raised constituted a defense to the action. Among these issues was the statute of limitations, and in our original opinion we held that under the rule of *nullum tempus occurrit regi* the statute did not apply. A rehearing was asked for, and a very large number of the leading lawyers of the state petitioned for leave to file briefs and argue the case as *amici curiae.* This petition was granted and, contrary to our usual custom, the motion for rehearing was heard on oral argument. Many eminent counsel appeared and presented

their views upon the question, both for and against the motion. Each and all, with one exception, stated, as preliminary to their arguments, that they were personally and vitally interested in the decision for the reason that they had clients whose rights in pending litigation would be materially affected by the conclusion finally reached by this court in regard to how far the doctrine of *nullum tempus occurrit regi* applies to suits by and against governmental agencies. The one exception claimed that he did not have a client with actual litigation pending which would be affected by our decision, but frankly admitted he had one who expected to engage in such litigation within a short period.

We desire to commend all of counsel for their frank and ingenuous statement of their interest in the result of the case, but it occurs to us that interest appears to have been not so much that the court should reach a decision which was correct as a matter of public policy, but that it should come to a conclusion which would not adversely affect the clients represented by them. For this reason, we have given to the various arguments presented not only the careful consideration which the ability of counsel deserves, but that critical examination which their interest in the result also makes necessary.

In reaching our conclusion, we have studied carefully all of the cases cited by counsel, but we have based that conclusion not upon the number of cases upholding a certain rule, nor the standing of the courts from which they come, but expressly and entirely upon the soundness of their reasoning as applied to the question of what rule is most in harmony with modern social and economic principles and the general public policy and welfare of the state.

Before, however, we proceed to a discussion of the general principles which control our decision, we think

it best to refer to the contention that this court is already committed to a rule contrary to that laid down in our original opinion by the case of *Griffith* v. *State*, 41 Ariz. 517, 20 Pac. (2d) 289. That was an action by the state of Arizona, on behalf of itself and Pima county, against a former county assessor and his bondsmen to recover public money which it was alleged the assessor had fraudulently converted to his own use. The claim was set up in that action that the complaint showed it·was barred by the statute of limitations under subdivision 3, paragraph 709, Civil Code, Revised Statutes of Arizona 1913, which reads as follows:

"There shall be commenced and prosecuted within one year after the cause of action shall have accrued, and not afterward, all actions or suits, in court, of the following description: . . .

"(3.) An action upon a liability created by statute, other than a penalty or forfeiture."

And a general demurrer was interposed on that ground. The demurrer was overruled and judgment was rendered against Griffith.

The sole issue in reference to the statute of limitations which was discussed and decided by us was whether the action was based upon a liability created by statute and, if so, when the right of action accrued. We held that the liability was created by statute, and, since the money was converted fraudulently and in breach of a trust, that the statute did not begin to run until the party defrauded discovered or was put upon reasonable notice of the breach of trust. As the complaint did not show when the fraud was discovered and the one year had already run, we held the court should have sustained the general demurrer, and·remanded the case for a new trial. The question of the application of the rule of *nullum tempus occurrit regi* to a suit by either the state or the

county was not discussed, nor even mentioned, in our opinion in the Griffith case, and was not considered by us in arriving at our conclusion. An assumption that the rule did not apply could only be drawn from, an inference that, if it did, we would have decided the case otherwise. The doctrine of *stare decisis* cannot be extended to implications from what was actually decided in a previous case. *Broadwater* v. *Wabash R. Co.*, 212 Mo. 437, 110 S. W. 1084. We think that principle applies to the Griffith case. We held that the statute of limitations would not apply as against Griffith under certain conditions, but we said nothing whatever as to whether it also would apply for another reason. It is extending the rule of *stare decisis* far beyond any reasonable limit to hold that our opinion in the Griffith case established the rule contended for by defendants in the present case. If we had thought it did, we would not, in the previous appeal of this case (44 Ariz. 233, 243, 36 Pac. (2d) 559, 563), have said:

"There is a serious conflict in the authorities as to whether statutes of limitations apply to municipal corporations unless the legislature expressly states that they do. We think, however, we need not decide the question as to whether in an action of this kind the city can claim that it represents the state in its sovereign capacity, and is thus exempt from the statute of limitations,"

but would have applied the rule as urged by defendants. We, therefore, consider the question as one of first impression in this state.

This involves an examination of some of the fundamental principles back of statutes of limitations. Considered only from the standpoint of abstract equity, 99 of every 100 men would unhesitatingly and correctly say that the mere lapse of time should never relieve one from the performance of a just obligation.

And were that the only excuse which could be given for the existence of statutes of limitations, it is safe to say they would never have been adopted. Unfortunately, however, as in most cases where it is necessary to establish a definite rule to be enforced by the court, the issue was not so simple.

In the case of *Masury & Son* v. *Bisbee Lumber Co.*, 49 Ariz. 443, 68 Pac. (2d) 679, we discussed these statutes somewhat at length, and pointed out that many bitter experiences taught that, if a claim was not made until many years after the right of action had accrued, it was frequently fraudulent in its nature, but that due to the lapse of time the evidence by which the defendant could otherwise have proved its character had disappeared. The choice of the legislative body was, therefore, between two rules, each one having some merits and some demerits. On the one hand, in the absence of any statute, no honest claim could be defeated by the mere lapse of time, but many fraudulent ones might prevail for the reason just given. On the other hand, if a limitation were placed on the time in which an action might be brought, some debtors might escape the performance of a just obligation, but fewer unjust claims could be successfully maintained. The question of which rule to follow became one of public policy, and, as is almost invariably the case when public policy is involved, the choice was only of the lesser of two evils. It was finally determined that the probability of many unjust claims after the lapse of time was so great that it outweighed the certainty of the loss of a few just debts, and it was therefore thought, as a pragmatic working principle of public policy, that it was better a few honest creditors lose their rights through a failure to present them within a certain time than that many alleged debtors should be mulcted through the presentation of dishonest claims because the lapse of time had prevented them from making a

proper defense. The statutes, therefore, while recognizing that the *right* would not be affected by the lapse of time, took away the *remedy* for the enforcement of the right for the reason given. But the courts, realizing the principle back of the statute, have always held that, unless the debtor expressly claimed its benefit, the suit would be heard on the merits of the claim, notwithstanding the period of limitation had run. Since it clearly appears the purpose of the statute was to meet a specific evil, it would seem that, if this evil does not exist in a certain class of cases, it is but reasonable to presume that the statute was not meant to apply to that class.

■ While the literal interpretation of the rule is that time does not run against the *king,* this was considered as referring to the king in his official capacity as representing the sovereignty of the nation, and not to the king as an individual. As was stated in the case of *Ralston* v. *Weston,* 46 W. Va. 544, 33 S. E. 326, 328, 76 Am. St. Rep. 834:

"And though it has sometimes been called a prerogative right, it is, in fact, nothing more than an *exception or reservation introduced for the public benefit,* and equally applicable to all governments." (Italics ours.)

■■ The substance of the rule has been re-enacted by our legislature every time it has recodified the law, and it now appears as section 2056, Revised Code 1928, which reads as follows:

"*State not subject to limitations.* The rights of this state shall not be barred by the limitations of actions prescribed in this chapter."

This statute, however, does not add to nor subtract from the common-law rule, but is merely a legislative recognition and approval thereof. Such being the case, the reason why statutes of limitations do not

and should not apply to the state, in the absence of an express declaration to the contrary by the legislature, is clear. The rights of the state are held by it in trust for the benefit of all of its citizens. They are enforced by actions of various natures, criminal and civil, but the purpose of their enforcement is always the common weal, and not the private benefit of any particular individual. The officers who are charged with the active duty of enforcing those rights have no personal profit to gain thereby, and therefore no inducement for the bringing of false and unwarranted actions. In other words, when an action is brought on behalf of the state, the almost conclusive presumption is that it is not, to the knowledge of those who bring it, illegal or inequitable, for it is not to be thought that the state will harass its citizens by unjust actions purposely delayed until long after the evidence which might show that the action was not based on right had disappeared. The fear of such actions, perhaps well founded when the dispute is one between private parties, is not reasonable where the state is the plaintiff. These considerations are apparent and ample justification for the rule, stated in the ancient maxim and confirmed by our legislature from time to time, that statutes of limitations which govern between private individuals do not apply in proceedings on behalf of the state.

It might seem to be a work of supererogation thus to elaborate on the reasoning which justifies the rule and is undoubtedly the cause of its existence. We think, however, that the principles which are back of the rule are all-important in considering and evaluating the cases which show the attempts made more or less successfully in other jurisdictions to whittle away the rights of sovereignty by denying the application of the rule to such rights when they are exercised by one of the agents of the state.

■ It is admitted of course by defendants, as it must be under an unbroken line of decisions and as approved by the express language of our statute, that when the state itself, in its own name, brings an action to establish rights which it holds in its sovereign capacity, that none of the various statutes of limitations run against such an action unless the legislature has expressly and definitely declared that they do. But it is contended the rule only applies to the state itself and not to its political subdivisions. This involves a discussion of the real meaning of the words "state" and "sovereignty" as used with reference to the ancient maxim. The word "state" is sometimes applied to a territorial area, and sometimes to those who inhabit that area, and it is, of course, in this latter sense that the word is used in our law. In the case of *Keith* v. *Clark*, 97 U. S. 454, 459, 24 L. Ed. 1071, the Supreme Court of the United States has defined a state of this kind in the following language:

" 'Nations or States,' says Vattel, 'are bodies politic, societies of men united together for the promotion of their mutual safety and advantage by the joint efforts of their combined strength. Such a society has her affairs and her interests. She deliberates and takes resolutions in common, thus becoming a moral person who possesses an understanding and a will peculiar to herself, and is susceptible of *obligations* and *rights*.' Law of Nations, sect. 1.

"Cicero and subsequent public jurists define a State to be a body political or society of men united together for the purpose of promoting their mutual safety and advantage by their combined strength. Wheaton, International Law, sect. 17."

The power by which a state accomplishes the purposes above set forth is commonly called sovereignty. In *Cherokee Nation* v. *Southern Kan. R. Co.*, (D. C.) 33 Fed. 900, 906, the court has defined the term "sovereignty" as follows:

"Vattel, in his Law of Nations (book 1, page 1), says: 'From the very design that induces a number of men to form a society which has its common interests, and which is to act in concert, it is necessary that there should be established a public authority to order and direct what is to be done by each in relation to the end of the association. This political authority is the sovereignty, and he and they who are invested with it are the sovereign. Sovereignty in government may then be defined to be that public authority which directs or orders what is to be done by each member associated, in relation to the end of the association.' It may be remarked, with us, the body of the nation has kept in its own hands the empire, or the right to command, and our government is therefore called a 'popular government.' Wheaton defines sovereignty, 'the supreme power by which any citizen is governed.' Hurd says: 'The supreme power in the state must necessarily be absolute, in being subject to no judge.' Jameson says: 'By the term "sovereignty" is meant the person or body of persons in a state to whom there is politically no superior.' Leiber has said: 'The necessary existence of the state, and that right and power which necessarily follow, is sovereignty.' Story says: 'By sovereignty, in its largest sense, is meant supreme, absolute, uncontrollable power; the *jus sumni imperii;* the absolute right to govern.' Yeaman, in his Study of Government, (484), says: 'This sovereignty is the last and supreme will in the direction and control of the affairs of society, and beyond or above which there is no political power, and no legal appeal. The word which by itself comes nearest being the definition of sovereignty is will or volition, as applied to political affairs. Government is not sovereignty. Government is the machinery or expedient for expressing the will of the sovereign power.' Definitions of sovereignty might be almost indefinitely multiplied, but these which have been given I believe to be sufficient to give an accurate idea of its nature. This sovereign power in our government belongs to the people, and the government of the United States and the government of the several states are but the machinery for ex-

pounding or expressing the will of the sovereign power.''

When the state itself is exercising the power of sovereignty, it is of course not subject to statutes of limitations. But since the state, used in the real sense of the word, is an abstract entity with its individual citizens as its component parts, it can no more act in and of itself than can a corporation which is in the same sense composed of its stockholders. Even the Hegelian philosophy, on which the authoritarian states, such as Russia, Italy, and particularly Germany, are based, is compelled to recognize that, although the state be a definite and living entity as distinct from its citizens, it can act only by and through one or more of those citizens as its agents. As was said in the case of *Union Bank* v. *Hill,* 3 Cold. 325, 43 Tenn. 325:

''The word 'State,' is used in various senses. In its most enlarged sense, it means the people composing a particular nation or community; and in this sense, 'the State,' means the whole people united into one body politic, and 'the State,' and 'the people of the State,' are equivalent expressions.

''But there is a more limited sense in which the word is used, expressive merely of the position or actual organization of the legislative, executive, or judicial powers. The sovereignty of a nation or State, may, in all respects, be absolute and unconditional, except the limitations which it chooses to impose upon itself; but the sovereignty of the Government organized within the State, may be of a very limited nature, extending to few or many objects—unlimited as to some, but restrained as to others. *The people composing a State, may divide its sovereign powers among various functionaries, and each, in the limited sense, would be sovereign in respect* to the powers confined to each.'' (Italics ours).

██ And not only is the state compelled to exercise its sovereignty through the action of individuals,

but it may, and often does, deputize to other political organizations the duty to carry on certain functions which, though limited in their scope, are in their performance as much an exercise of sovereignty as when the corporate state itself exercises its universal sovereignty. These subordinate bodies are created by virtue of the sovereignty resting in the state; they draw all their powers from that sovereignty, and *are created for the sole purpose of exercising the limited part of sovereignty delegated to them.* We cannot conceive of a county, a municipal corporation, or a school district as exercising any functions whatever except by right of such delegated sovereignty, and it is solely for the purpose of promoting the common weal of its citizens, either of the state as a whole or of the particular subdivision thereof in question, that such power is delegated.

The reasons which we have set forth why the evil which caused the enactment of the various statutes of limitations cannot be presumed to exist in actions by the state itself, obviously apply with equal force to actions by the various subdivisions of the state. The only excuse which may be logically advanced why the statutes of limitations should apply to one of the political subdivisions of the state, when they do not apply to the state itself, and, indeed, practically the only one seriously urged by the cases which have made such applications, is that the particular right in issue in the specific case is not a right involving the sovereignty of the state, but one which appertains to the subdivision in a private capacity. Such a thought will be found to be back, though frequently not stated or even realized by the court itself, of the reasoning in practically all of the cases cited by the defendants, such as *Brown* v. *Board of Education,* 148 Okl. 97, 298 Pac. 249; *Payette* v. *Marshall County,* 180 Iowa 660, 163 N. W. 592; *City of Los Angeles* v. *County of Los*

*Angeles,* 9 Cal. (2d) 624, 72 Pac. (2d) 138, 113 A. L. R. 370, and many others. But the idea of a county, a municipal corporation, or a school district properly exercising its functions for the ultimate purpose of private benefit or advantage to a private individual, as against the mass of its citizens, or indeed of having any private, as distinct from public, rights or functions, is impossible to justify any logical and consistent argument.

We think the reason for these decisions is that the courts which rendered them had their minds fixed on the theory that the sovereign *powers* of the state were limited by the ideas prevailing in the middle ages as to the *functions* to be exercised by the state. These functions were originally very little more than the maintenance of public peace and order, protection against foreign enemies, and the upkeep of public highways. It will be remembered that in Anglo-Saxon times substantially the only duties of citizens of the state as such were to bear arms to protect the nation against invasion, to join the *posse comitatus* to apprehend the violator of the criminal law, and to maintain roads and bridges. While the duties of the state were increased from time to time quantitatively, we think it is not too much to say that, up to the early days of the last century, its functions had not been greatly extended qualitatively, and it was but natural that the courts then as always by their very nature the most conservative of the great branches of government, clung to the ancient landmarks long after the legislative and administrative departments of the state, more responsive to the changing ideas of the nation, realized that the functions of government had progressed far beyond their original limited sphere. There was a time, not so long ago, when it was seriously argued that neither the municipalities nor, indeed, the sovereign state itself had the right to enter

such fields as municipal waterworks, transportation systems, and gas and electric light plants, and that any attempt to do so was not only a violation of particular constitutional limitations, but of the fundamental principles of society itself. Such doctrines are now as archaic in most of the modern world as the principles of the feudal system or of the patriarchal form of government. And yet so recent is this change that, when the Constitution of Arizona was enacted, it was thought necessary to insert therein section 5 of article 13, which reads as follows:

"Every municipal corporation within this State shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from said municipal corporation."

It is not surprising that courts obsessed with such ideas as to the limited scope of the functions of the state, and yet compelled to recognize the fact that its various subdivisions were constantly engaging in activities far beyond those limits, empowered thereto by legislative and even constitutional enactments, in an endeavor to reconcile ancient theory and modern fact, evolved the doctrine that the new activities were private in their nature, instead of following the principle of sovereignty to its logical conclusion and holding that all these new activities could be justified and sustained only by recognizing they were based on principles always necessarily included in the very definition of sovereignty, but dormant until changing economic, political, and social conditions required their application.

We think, therefore, that the cases which hold statutes of limitations apply to subdivisions of the state because they are acting for the private advantage of a limited number of its citizens must be read and evaluated in the light of the fact that the changed

political, social, and economic conditions, under which they now operate, require an application of powers, always inherent in the very nature of sovereignty, and explained and justified only by that sovereignty, but impossible of being sustained by the theory of private rights. This application has been approved repeatedly of recent years by that body in which the ultimate sovereignty rests—the people of the United States. And the wiser courts, recognizing that their only function is to explain and apply the will of the sovereign, as constitutionally expressed, will adjust their ideology to existing conditions, rather than attempt to explain and limit those conditions by an obsolescent theory of government.

But even if we apply the rule only in its most limited interpretation and hold that there are functions which may be exercised primarily for the benefit of the citizens of a particular municipality, and only secondarily for the benefit of citizens of the state as a whole, and that although these functions can only be based on and exercised by virtue of the sovereignty of the state, yet by reason of such limited application they may suffer a mysterious transmutation of character and become, in the eyes of the law, private instead of public in their nature, we think that, in instances like those involved in the present case, there can be no question that the rights sued upon by the plaintiff are public in the strictest sense of the term. One of the most important powers of sovereignty is that of taxation—the taking from a citizen of a contribution against his will, to be applied to purposes of which he may not approve. No state or subdivision thereof may exercise this power of taxation except by virtue of the power of sovereignty, and when the proceeds of that tax are to be applied by a subordinate agency of the state, either in whole or in part, to the execution of functions which are neces-

sarily and admittedly for the benefit of the people of the state as a whole, even though exercised by and in the name of the subdivision, we think there can be no question but that the levying, collection, and use of such tax involves in every particular the rights of the state itself, though acting through one of its delegated agents. The municipalities of the state of Arizona, whether acting under the general law or by virtue of the provisions of section 2 of article 13 of the Constitution, have no powers except those delegated powers of sovereignty given them by virtue of the Constitution or the statute. They are each and all charged with the duty of performing many of the functions which, from the birth of our country, have been exercised by the state for the benefit of its citizens as a whole, such as the preservation of peace and public order, the improvement of the public highways, and the protection of the public health. When, therefore, the plaintiff in this case brought this action, it was seeking to recover a tax which was due it, and which was to be used by it, in an indivisible part at least, in the carrying on of state functions. And since such is the case, we think the statute of limitations does not run against it any more than it would against the collection of a tax levied by the state itself for the purpose of maintaining the same essential functions. But not only does abstract reasoning on the nature of the state and its sovereignty sustain the rule as we have declared it, but we think that, as a matter of public policy, it is infinitely to be preferred to the one contended for by defendants. In the vast majority of cases where it is sought to apply the statute of limitations to a subdivision of the state, the question involves the embezzlement of public funds by a public officer, or the diversion of public funds to an unauthorized purpose, without any right in the party who retains such funds. To permit an em-

bezzling treasurer and his bondsmen to know that, if they can only delay action for a time after the defalcation is discovered, they may go scot-free; to permit those who without a shadow of right secure the payment to them of public moneys to retain the same if they can only delay an action to recover them for a short period, whether the error be discovered or not, is not, in our opinion, consonant with sound principles of public policy. We think that hardly a case can be found in the books where the defense of the statute of limitations has been sustained as against a county or municipal corporation, but that the ultimate result outrages every sense of natural justice. If the legisture desires to throw the mantle of the statute over such derelictions of duty, it may do so, but we will not conclude that to be its intention until it states it explicitly.

We conclude, therefore, both as sustained by sound reasoning as to the cause and purpose of statutes of limitations and the nature of the state and of sovereignty, and as a matter of wise and farseeing public policy, that the rule of *nullum tempus occurrit regi* applies not only to the state itself when suing in its own name, but to all of its subdivisions, under circumstances like those involved in the present case.

The petition for rehearing is denied.

McALISTER, C. J., concurs.

ROSS, J., dissents.