733 P.2d 1131

**J.N. TRIMBLE, Director of Insurance, the Arizona Corporation Commission, body politic, and Matthew J. Zale, Director of Securities, Plaintiffs-Appellees, Cross-Appellants,**

v.

**AMERICAN SAVINGS LIFE INSURANCE COMPANY, an Arizona corporation, Frihoff N. Allen, Joseph L. Allen, Evan C. Porter, Gerald M. Allen, Taft L. Allen, Elijah C. Allen, Orrin C. Fuller, Clark E. Allen, Richard B. Young and John Does I–L, Defendants-Appellants, Cross-Appellees.**

**No. 1 CA–CIV 8003.**

Court of Appeals of Arizona, Division 1, Department D.

Oct. 23, 1986.

Reconsideration Denied Dec. 10, 1986.

Review Denied March 11, 1987.

**550**

Robert K. Corbin, Atty. Gen. by Patrick M. Murphy, Chief Counsel Financial Fraud Div., Phoenix, for plaintiffs-appellees, cross-appellants.

Beus, Gilbert, Wake & Morrill by Neil Vincent Wake, Phoenix, and Wentworth & Lundin by Robert Ong Hing, Scottsdale, and Gove L. Allen, Mesa, for defendants-appellants, cross-appellees.

Warner Angle Roper & Hallam, P.C. by Jerry L. Angle, Phoenix, Deputy Receiver.

1. The "Inflation Beater" is also referred to as "Third Party Security Agreement." For purposes of continuity, we refer to both the Infla-

tion Beater and Third Party Security Agreement transactions as Inflation Beaters.

## OPINION

GRANT, Presiding Judge.

This is an appeal by American Savings Life Insurance Company and its officers, directors, and executives (American Savings) from the trial court's adoption of a plan of reorganization. The state has cross-appealed.

## FACTS

On March 2, 1977, the State of Arizona (State) filed a lawsuit, through the directors of insurance and securities, against American Savings. The suit alleged a securities and insurance fraud involving the sale of an investment package called the Inflation Beater.[1] The complaint asked for injunctive relief and an order appointing an agent of the court to supervise the orders prayed for, and relief for the purchasers of the Inflation Beater.

The Inflation Beater comprised two basic parts, life insurance and stock. A typical investor purchased a $20,000 face amount life insurance policy for an annual premium of $600. Simultaneously, he signed a promissory note for $10,000. In exchange he received 2,000 shares of American Savings stock at $5 per share. The company told the investors it would repurchase the shares for one dollar per share. An investor did not have to make payments on the note as long as he paid the insurance premium. The note was secured by the company's possession of the stock certificates, the investor's assignment of the cash value and death benefits of the insurance policy to American Savings, up to the amount of the note, and stock and cash dividends. The investor had no right to sell or assign his stock until the stock note was paid in full.

The net result of the Inflation Beater was that the face amount of the life insurance policy did not reflect the actual benefits payable under the policy. Actual pay-

ments to a beneficiary would be the face amount minus the note (and interest as required in some contracts), presumably plus a promised repurchase of stock by American Savings at $1.00 per share for each released share.

At trial, the State proved that the Inflation Beater was a pyramid scheme. American Savings's impressive financial statements were found to be the result of accounting practices constituting "a device, scheme, or artifice to defraud and an omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," a violation of A.R.S. § 44–1991. The court noted that:

> the prospectus and other related financial reports were of such a nature that only a person well trained in accounting or a very sophisticated investor could have ascertained the stock pyramid that was occurring. In the beginning, it is doubtful that even an accountant or a sophisticated investor would have foreseen the ultimate results.

The trial court set out the accounting principles violations committed by American Savings [2] and found that:

> treatment of the stock notes as an asset at full face value, particularly without a full, complete and adequate disclosure, is not consistent with generally accepted accounting principles and likewise constitutes a violation of A.R.S. [§] 44–1991, as well as A.R.S. [§] 44–1992.

As a result of the violation of A.R.S. §§ 44–1991 and 44–1992, the trial court is-

sued its order on September 26, 1977 permanently enjoining American Savings from selling the Inflation Beater and appointing Phoenix attorney Jerry Angle as an "agent of the court." The order also directed the parties to prepare a plan of reorganization. On July 11, 1978, the court found that "the insurer has wilfully violated the laws of the State of Arizona." It appointed J.N. Trimble, the Director of Insurance, as the statutory receiver for American Savings, and designated Jerry Angle as a deputy receiver, pursuant to A.R.S. § 20–631.

American Savings appealed. This court affirmed the injunction and appointment of a receiver. *Trimble v. American Savings Life Insurance Company*, 1 CA–CIV 4488 and 1 CA–CIV 4489 (consolidated) (Memorandum Decision filed September 24, 1981) (two judges concurring). No program for rescission was before the court in the *Trimble* memorandum decision. The case was remanded to the trial court for further necessary proceedings.

The trial court undertook to adopt a plan of reorganization. It received evidence on the issues relevant to rescinding the Inflation Beater packages. On June 15, 1984, the court entered its judgment approving a plan of reorganization. American Savings appealed and the State cross-appealed. Specifics of the plan will be set forth as needed for resolution of the issues raised in the appeal and cross-appeal.

The issues raised by American Savings may be divided into three broad categories: whether American Savings is entitled to a hearing on the merits of each investor's

---

**2.** The company's stock has a par value of 10 cents per share. From the $10,000.00 note, $200.00, the par value of 2,000 shares, would go to paid-in capital and the balance of $9,800.00 would go to capital in excess of par. Following this procedure, the stock notes in 1976 equalled approximately $22,000,000.00 of the company's total assets of approximately $32,000,000.00, or in other words well over one-half of the company's total assets. Based on these "ever increasing assets and growth" stock dividends were declared at the rate of three 10 percent stock dividends per year. The stock dividends were not based on the earnings of the company but were based on the continuous sale of stock.

When stock dividends were declared, the company would transfer 10 cents per share, the par value, for each share from capital in excess of par to the paid-in capital account. Under the program as it existed, the only way the company could have continued with stock dividends as it had been doing for the past four years was by the continued sale of stock.

\* \* \* \* \* \*

Under the financial structure of the company as it existed, the investors' only hope of getting even or ahead as was projected would be to continue to receive the pyramiding stock dividends coupled with the continued ability to sell the stock at $1.00 per share.

claim; whether the award of prejudgment interest was proper; and, whether the trial court correctly applied the securities violation statute of limitation. The State's cross-appeal also questions the correctness of the trial court's application of the statute of limitation.

## LITIGATION OF INDIVIDUAL CLAIMS

American Savings seeks a remand to have each investor's claim litigated on the issues of reliance, causation, materiality and due diligence. It claims this right on two theories: these are elements of the securities statutes which must be proven by a plaintiff, or they are affirmative defenses, which the defendant must have an opportunity to present as a matter of due process; and, the insurance rescission statute, A.R.S. § 20–628, requires a hearing on the validity of each individual claim. However, we note that if the investors' reliance, causation, materiality and due diligence are not elements of or valid defenses to the state's claim, no hearing is required under either theory; the issues are simply irrelevant.

Arizona Revised Statutes, § 44–1991 states:

It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities ... directly or indirectly to do any of the following:

1. Employ any device, scheme or artifice to defraud.

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

Arizona Revised Statutes, § 44–1992 states:

It is a fraudulent practice and unlawful:

1. For a person to subscribe to or make or cause to be made an untrue statement of a material fact in an application, registration statement, prospectus, financial statement or document required to be filed under any provision of this chapter or any rule, regulation or order of the commission thereunder.

2. To omit or cause to be omitted from any such application, registration statement, prospectus, financial statement, or other statement or document, a material fact or statement necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

The trial court found that American Savings implemented a sophisticated scheme to defraud purchasers of the Inflation Beater through, among other things, improper accounting practices, financial statements which greatly inflated the company's assets, and the use of stock dividends to project the illusion of growth. These, according to the trial court, were omissions of material fact and violations of both sections, A.R.S. §§ 44–1991 and 44–1992.

The defendant argues that the trial court failed to accord it an opportunity to disprove reliance, due diligence and causation as to each investor. The Arizona Court of Appeals has held that reliance upon a misrepresentation is not an element of § 44–1991, the antifraud provision of our securities law. *Rose v. Dobras*, 128 Ariz. 209, 214, 624 P.2d 887, 892 (App.1981); *cf. Washington Nat'l Corp. v. Thomas*, 117 Ariz. 95, 570 P.2d 1268 (App.1977).

To the contrary, federal courts have interpreted § 44–1991 to require a plaintiff in a nonpublic action to prove he reasonably relied on defendant's misstatements and was unaware of the untruth or omission of fact. *McDaniel v. Compania Minera Mar de Cortes*, 528 F.Supp. 152, 166 (D.C.Ariz.1981). However, the instant case is a public, not a private, action. In addition, if the plaintiffs are so numerous as to make it infeasible to determine individual reliance, *Mills v. Electric Light Co.*, 396 U.S. 375, 382 n. 5, 90 S.Ct. 616, 620 n. 5, 24

L.Ed.2d 593, 601 n. 5 (1970), or where the claim is based on an omitted material fact, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–53, 92 S.Ct. 1456, 1471–72, 31 L.Ed.2d 741, 761 (1972), federal courts will find constructive reliance. 5 A.S. Jacobs, *Litigation and Practice Under Rule 10b–5* § 624.01(b)(i) (2d ed. 1986 revisions). This exception would apply in this case.

Moreover, reliance is not an element of § 44–1992. This section addresses incorrect statements made to the state, whether or not made to investors. Therefore, whether the investors relied upon those misrepresentations has no bearing on the purpose of § 44–1992. *See State v. Tarzian,* 136 Ariz. 238, 665 P.2d 582 (App.1983); *Barnes v. Vozack,* 113 Ariz. 269, 550 P.2d 1070 (1976).

■ Defendants also claim that investors must act with due diligence and that they would have discovered any misrepresentations had they so acted. Defendants' argument is unfounded. The statutes do not require investors to act with due diligence; nor do we find any judicial authority in Arizona for such a requirement. To the contrary, defendants have an affirmative duty not to mislead potential investors. *Washington Nat'l v. Thomas,* 117 Ariz. at 102, 570 P.2d at 1275. This requirement not only removes the burden of investigation from an investor, but places a heavy burden upon the offeror not to mislead potential investors in any way. The trial court has correctly found against the defendants.

Finally, defendants claim that they are entitled to a hearing on the issue of whether their alleged misstatements caused the victim's injuries. In Arizona, the requirement of causation has been suggested as an element of a § 44–1991(2) violation. *Washington Nat'l v. Thomas,* 117 Ariz. at 101, 570 P.2d at 1274. It is unclear from the statutory language whether causation is an element of A.R.S. § 44–1991(1) or § 44–1992. Under § 10(b) and rule 10b–5 of the 1934 Securities Exchange Act, some causal nexus must exist between a defendant's acts and the plaintiff's injury. 5 A.S. Jacobs, § 64.02, at 3–332.

■ Federal courts find that the "plaintiff succeeds in proving causation for securities fraud once the misstatement or omission has been shown to be 'material.'" *Plaine v. McCabe,* 797 F.2d 713, 721 n. 15 (9th Cir.1986), citing *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214 (9th Cir.1980). Materiality is an element of §§ 44–1991(2) and 44–1992. Arizona has previously adopted an objective test for materiality. The test to be met is simply a showing of substantial likelihood that, under all the circumstances, the misstated or "omitted fact would have assumed actual significance in the deliberations" of a *reasonable* buyer. *Rose,* 128 Ariz. at 214, 624 P.2d at 892, quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Under this test, there is no need to investigate whether an omission or misstatement was actually significant to a particular buyer. *See* A.S. Jacobs, § 61.02. Thus, the same objective test is used to establish both materiality and causation.

■ The trial court's finding of materiality under § 44–1991(2) constitutes its determination that the misrepresentations and omissions made by the defendants were a substantial factor in a reasonable buyer's decision to invest. We see no reason to require individual determinations as to causation. The trial court's finding is reasonably supported by the evidence. The misrepresentations concerning the value of the stock, the company assets and stock dividends directly relate to the attractiveness of the investment. *See Harmsen v. Smith,* 693 F.2d 932, 946 n. 11 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983):

> Proof of each plaintiff's reliance on the misrepresentations or omissions is not a prerequisite to recovery.... [I]f omissions or nondisclosures meet the standards of materiality to a reasonable investor, causation and reliance can be assumed.

American Savings next argues that by continuing to pay premiums on the Inflation Beater and failing to tender the securities back to it after receiving notice of fraud the investors waived any right to rescind.

 It is a generally accepted rule of contract law that by continuing to accept performance known to be deficient, one waives the right to reject the contract. *Smith v. Hurley*, 121 Ariz. 164, 589 P.2d 38 (App.1978). This rule is predicated on the assumption that one seeking to rescind would be unjustly enriched by receiving the benefits under the contract as well as the consideration. However, the general rule is inapplicable in the instant case. Defendants have committed a fraud upon the investors. This fraud has put the investors in a no-win situation. If the investors discontinued premium payments, they received only a few shares of stock and the minimal cash surrender value of the life insurance policy. By continuing to make the payments they could hope to salvage any possible value of the original transaction. Tendering the stock for cash is an inadequate remedy as well. This situation is a far cry from that for which the rule was created. We therefore decline to apply it to the facts of this case.

The defendants also argue that those investors who terminated their payments are likewise barred from recovery. The defendants, calling the termination a "mutual cancellation," reason that the victims have elected their remedy by allowing the company to terminate the policy and apply the cash surrender value to the note.

 This claim is equally without merit. By it, defendants attempt to characterize the termination of payments as a settlement. The plan recognized this as erroneous by specifically providing that lapsed policies are covered by the plan while transactions terminated by litigation or compromise are not. To be given final effect, a settlement must be entered into fairly and

in good faith. *Shelton v. Grubbs*, 116 Ariz. 230, 568 P.2d 1128 (1977). By discontinuing payments, it cannot be said that the investors intended to relinquish all claims for fraud, and thus elected their remedy. Under the defendants' reasoning, both those continuing and those discontinuing premium payments are barred from further recovery. This would leave no victims to be compensated. This result is clearly contrary to the entire purpose of the plan of reorganization and we reject these arguments.

American Savings also contends that it is entitled to a hearing pursuant to A.R.S. § 20–628 on each investor's claim in order to raise "various denials or defenses" such as lack of reliance, causation, materiality and due diligence. Because we hold that these "denials and defenses" are not available, we see no reason for such hearings.

## STATUTE OF LIMITATIONS

The plan of reorganization gave an option of rescission of Inflation Beaters to investors who purchased packages on or after March 1, 1974. The trial court did not explain why only those investors purchasing after March 1, 1974 were entitled to elect rescission. It may have believed that A.R.S. § 44–2004 required it to do so.

The applicable statute is as follows:

No civil action shall be brought under this article to enforce any liability founded upon the violation of article 13 [which includes A.R.S. §§ 44–1991 and 44–1992] unless brought within one year of the discovery of the fraudulent practice upon which the liability is founded, or after such discovery should have been made by the exercise of reasonable diligence, and in no event shall such action be brought more than three years after the fraudulent practice occurred.[3]

A.R.S. § 44–2004(B).

We have considered the several arguments in the appeal and cross-appeal on

---

3. Effective until August 27, 1977. Laws 1977, Ch. 76, § 10. The subsequent version deleted "and in no event shall such action be brought more than three years after the fraudulent practice occurred" and lengthened the limitations period from one to two years.

statutory interpretation of this section on whether various exceptions should toll or bar application of the statute of limitations. These issues include:

1. whether this is a public enforcement action so that the state is immune from the defense of statute of limitations;

2. whether the injunction prohibiting investors from filing suit against American Savings without first obtaining court permission tolled the statute;

3. whether the trial court correctly determined that the state's complaint triggered the application of the statute;

4. whether the doctrine of fraudulent concealment tolled application of the statute.

█ We conclude that the state is immune from the statute of limitations defense, despite the ancillary benefit from this action to investors. The trial court's application of the statute of limitations to this case was erroneous and we reverse on that point. Our conclusion renders resolution of the other limitations issues unnecessary.

At common law, the state was immune from statutes of limitation under the rule of *nullum tempus occurrit regi* (time does not run against the king). Although the doctrine was originally established as a royal prerogative similar to sovereign immunity, its role under modern law is to prevent the public from suffering " 'because of the negligence of its officers and agents' in failing to assert causes of action which belong to the public." *City of Shelbyville v. Shelbyville Restorium*, 96 Ill.2d 457, 459, 71 Ill.Dec. 720, 722, 451 N.E.2d 874, 876 (1983). The rule is recognized in Arizona. *City of Bisbee v. Cochise County*, 52 Ariz. 1, 10, 78 P.2d 982, 985 (1938).

█ The rule applies if the right which the governmental unit seeks to assert is in fact a right belonging to the general public. It does not apply if the right belongs only to the government or to some small and distinct section of the public. The fact that the relief sought by the state will recompense an individual member of the public does not necessarily diminish the interest or authority of the state in prosecuting the action. *See, e.g., City of Shelbyville*, 96 Ill.2d 457, 71 Ill.Dec. 720, 451 N.E.2d 874 (1983) (state action to force contractor to pave subdivision); *United States v. Sheff*, 194 F.2d 596 (9th Cir.1952) (action by the federal government for restitution to victims of housing rental overcharges not barred by statute of limitations); *Securities & Exchange Comm'n v. Penn Central Co.*, 425 F.Supp. 593, 599 (E.D.Pa.1976) (disgorgement does not render securities enforcement action predominantly one for private benefit; statute of limitations defense not applicable); *State v. Brotherhood Bank and Trust Co.*, 8 Kan. App.2d 57, 649 P.2d 419 (1982) (statute of limitations not applicable to state collecting damages for aggrieved consumers under Kansas Consumer Protection Act).

The case of *Herrmann v. Cissna*, 82 Wash.2d 1, 507 P.2d 144 (1973) is particularly instructive on the issue of whether the state herein is subject to the affirmative defense of the statute of limitations. Herrmann, the commissioner of insurance, brought suit to recover damages caused by corporate mismanagement of an insurance company. The Washington Supreme Court recognized that the action would benefit the insurance company, and that the policy holders would be the real beneficiaries. Nonetheless, the action was held to be one for the public, not subject to a statute of limitations, because the insurance rehabilitation statutes were enacted in the interest of the public generally. "Actions taken by the commissioner in the discharge of his statutory responsibilities while they undoubtedly benefit some private parties, are taken primarily in the public interest. . . ." *Id.* at 6, 507 P.2d at 147.

We agree that the proper focus must be on the legislative intent of insurance rehabilitation statutes: to benefit the public generally. When an insurer commits acts which are grounds for rehabilitation, such as violation of the Arizona securities laws, the corrective measures taken by the state through the director of insurance benefit

the public as a whole. The public interest is served by the cessation of illegal and fraudulent acts. Requiring the insurer to make restitution to the victims has a deterrent effect, which also serves the public interest. *Id.*

We emphasize the importance of the insurance rehabilitation statutes in this matter. The earlier *Trimble* memorandum decision and its concurrence agreed that A.R.S. § 20–620(A)[4] authorized the director to formulate a rescission option. The fact that the action in its present status is directed toward remedies for individuals does not diminish the public interest nature of the proceeding.

■ Finally, the language that A.R.S. § 44–2004(B) applies to any "civil action" does not change our conclusion. Statutes of limitation in public enforcement actions as opposed to criminal prosecutions do not run against the state "unless the legislature has expressly and definitely declared that they do." *City of Bisbee v. Cochise County,* 52 Ariz. at 10, 78 P.2d at 985. *See State v. Gunnison,* 127 Ariz. 110, 618 P.2d 604 (1980) (Holohan, J. specially concurring). Unless the legislature expressly declares that a statute of limitations bars an action brought for the public benefit we will not give it effect. *See Estate of O'Connor v. Arizona Dept. of Rev.,* 139 Ariz. 450, 679 P.2d 96 (App.1984).

Since we see no basis for the March 1, 1974 limitation on the option of rescission, in the further proceedings upon remand required in this matter, all purchasers of the Inflation Beater packages shall be entitled to exercise the option of rescission. We remand with directions to modify the plan of reorganization accordingly.

### ITEMS INCLUDED IN THE FAIR COST OF INSURANCE

As noted above, American Savings complains about the trial judge's decision to exclude various expenses from the offset for the fair cost of the life insurance sold as part of the Inflation Beater package.

At the hearing the state's expert witness testified that under the facts of this case, only mortality expenses should be allowed. The defendant's witness gave higher estimates of those expenses, and included expenses such as commissions, selection and issue costs as fair costs of insurance. However, he learned of the finding of fraud against American Savings for the first time at the hearing—after he had given his estimates.

■ Whether expenses such as sales commissions, selection and issue costs, premium taxes and maintenance costs should be included in the fair cost of insurance was for the trial court to determine in the exercise of its discretion. *Rose v. Dobras,* 128 Ariz. at 215, 624 P.2d at 893. There is no clear abuse of that discretion, particularly in this case where the face amount of each policy did not reflect its actual value.

The defendant cites authority for the proposition that one rescinding an insurance contract must pay for benefits received. This authority is inapplicable because it deals solely with insurance policies. The insurance policies in this case were secondary, and sometimes incidental, in importance to the whole Inflation Beater package. Many investors bought the life insurance only because they were told they could not purchase the stock otherwise. Indeed, one investor testifying at the October 1983 hearing was told by the insurance agent that a discrepancy in her policy concerning the amount of coverage "didn't matter." The insurance policies in this case were merely a vehicle for perpetrating the larger securities fraud. Clearly, the expenses of perpetrating a fraud are not fair costs, or ones for which the perpetrator should be recompensed by the victim. The offset for only mortality expenses seems most logical because they are some of the few expenses which relate directly to the life insurance. The trial judge's ruling that only mortality expenses should be included in the offset is affirmed.

---

**4.** A.R.S. § 20–620(A) reads, "An order to rehabilitate a domestic insurer shall direct the director ... to take such steps toward removal of the causes and conditions which have made rehabilitiation necessary as the court may direct."

## PREJUDGMENT INTEREST

The trial judge ordered that:

[a]ll payments payable by American to investors under the terms of this plan shall bear interest from the date of payment to American by the investor at the rate of six percent (6%) per annum until January 1, 1980, and ten percent (10%) per annum from January 1, 1980, until paid.

The increased interest rate reflects the change in the legal rate of interest from six percent to ten percent, A.R.S. § 44–1201(A) (as amended by Laws 1980 2d S.S., Ch. 2, § 4, effective December 14, 1979).

█ The general rule in Arizona is that a liquidated claim entitles its holder to prejudgment interest. As this court explained, "[a] claim is liquidated if the evidence furnishes data, which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Autonumerics, Inc. v. Bayer Indus.*, 144 Ariz. 181, 193, 696 P.2d 1330, 1342 (App.1984), citing *Arizona Title Ins. v. O'Malley Lumber*, 14 Ariz.App. 486, 484 P.2d 639 (1971). *See also Lake Havasu Community Hosp. v. Arizona Title Ins.*, 141 Ariz. 363, 378, 687 P.2d 371, 386 (App.1984).

The core of the dispute centers on whether the "fair cost of insurance" is a liquidated claim by American Savings. The reorganization plan provided that an investor who chose to rescind the inflation beater package would receive the consideration paid, plus interest, less "an amount equal to the fair cost of the effective insurance coverage provided to the investor." The fair cost of insurance was defined by the trial court as mortality expenses, determined by reference to a particular table on mortality, applied to the face amount of the policy. The judge arrived at this definition after considering expert testimony presented in an October, 1983 hearing.

The plan's definition of the fair cost of insurance was far narrower than that proposed by American Savings. American Savings sought to include mortality expenses, selection and issue costs, maintenance costs, premium taxes and sales commissions. American Savings argues that there are genuine disputes over the fair cost of insurance sufficient to prevent the claim from being liquidated. The State's response is that there was no real dispute among the experts over this issue and that the claim was therefore liquidated. It further argues that A.R.S. § 44–2001, allowing a purchaser of a voidable security to "recover the consideration paid for the securities, with interest thereon," permits an award of prejudgment interest even on unliquidated claims.

In their rush to characterize the *insurance* costs as liquidated or unliquidated, both parties have mischaracterized the claim. The claim involved is that for consideration paid. This claim is clearly liquidated. The amount paid by investors is easily ascertainable without reliance on opinion or discretion. Neither side questions what amount was paid by investors as consideration.

█ The "fair cost of insurance" is merely an offset, not a claim. The only possible unliquidated aspect of the claim is the amount of this offset. When there is a liquidated claim and an unliquidated offset, the offset does not render the entire claim unliquidated.

It appears to be the well-recognized rule that if the amount due under a contract is ascertainable, but is reduced by the existence of an unliquidated set-off or counterclaim, attributable to the contract, interest is properly allowable on the balance found due from the due date.

*Homes & Son Construction Co. v. Bolo Corp.*, 22 Ariz.App. 303, 306–07, 526 P.2d 1258, 1261–62 (1974) (*dictum*). Consequently, while the fair cost of insurance may have been an unliquidated amount, that fact does not change the liquidated nature of the claim, i.e. consideration paid. The amount of the offset is within the trial court's discretion. *Rose v. Dobras*, 128 Ariz. at 215, 624 P.2d at 895.

█ We believe that an award of prejudgment interest may serve not only to recompense the victim but to deter defendants from attempting to benefit from de-

lays in litigation. *See General Facilities, Inc. v. National Marine Service, Inc.,* 664 F.2d 672, 674 (8th Cir.1981). Such an award promotes the legislative purpose evidenced by the adoption of the legislation giving rise to the claim. *See Garcia v. Burlington Northern R.R.,* 597 F.Supp. 1304, 1307 (D.C.Colo.1984).

█ In the present case, defendants received insurance premiums over a period of time beginning more than ten years ago. For whatever reason, defendants have engaged in protracted litigation since 1977 which has delayed significantly their having to return the consideration to investors. The legislature has expressed an intent through its statutes to stem the defrauding of innocent investors. A prejudgment interest award is particularly appropriate in such cases. *See Myron v. Chicoine,* 678 F.2d 727, 733 (7th Cir.1982); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1051 (7th Cir.) *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). Given these considerations, the trial court was well within its discretion in awarding prejudgment interest. Because we hold that the amount in dispute was a liquidated claim with an offset, we need not reach the question of whether A.R.S. § 44–2001 by its terms allows prejudgment interest on unliquidated claims.

As a final matter, the parties very briefly debate the trial court's failure to suspend the accrual of interest for the time when American Savings was enjoined from contacting investors to settle their claims. American Savings cites two cases for the proposition that interest should not be awarded when a litigant is precluded from settling a claim because of judicial restraint. *Gaston v. Shunk Plow Co.,* 161 Ga. 287, 130 S.E. 580 (1925); *Ide v. Aetna Ins.,* 232 Mass. 523, 122 N.E. 654 (1919). The rule recited by American Savings appears to be a correct statement of the general law.

> Persons who are prevented from paying over money by process of the court, such

as writs of injunction and the like, are not liable for interest. This is so because it would be unreasonable for the law to forbid a thing to be done and then to mulct the party in damages in an assessment of interest for not doing it. The law works no such injustice, and is chargeable with no such absurdity. The whole doctrine of interest is based upon the idea that it is a profit or premium properly payable for the use of money with which one man has of the money of another. So there can be no allowance of interest on a fund in the hands of the court or its receiver, or that is being brought in by the receiver, unless the fund produces interest.

*Gaston v. Shunk Plow Co.,* 161 Ga. at 304, 130 S.E. at 588. (Citations omitted.) *See also Bank of China v. Wells Fargo Bank and Union Trust,* 209 F.2d 467, 475–76 (9th Cir.1953) (money deposited in court, pursuant to court order requiring court permission to pay out, does not ordinarily bear interest for recipient).

█ We believe the circumstances of this case are outside the general rule. The injunction [5] did not prohibit American Savings from settling claims, it only prevented American Savings from initiating settlement discussions. The injunction also did not require American Savings to segregate the rescission funds. Instead, American Savings could use its funds for reasonably necessary operating expenses and make other disbursements and investments with the approval of the agent of the court. American Savings had the use of the money obtained by its fraudulent scheme for many years. Under the conditions of this injunction, American Savings should not escape payment for the use of the investors funds.

█ The final argument over prejudgment interest is whether the investors were required to make demands for payment to be entitled to prejudgment interest. *See Fairway Builders v. Malouf Towers Rent-*

---

**5.** We assume that the portion of the injunction at issue is the one enjoining American Savings from "[m]aking any statement or taking any actions designed to influence stockholders as to the value of their stock or as to their choice of relief under any court ordered reorganization."

*al Co.*, 124 Ariz. 242, 264–65, 603 P.2d 513, 535–36 (App.1979). We disagree with American Savings that the investors had to make demands for payment on their claims to earn prejudgment interest. Investors were unaware of the nature of American Savings's scheme until the complaint was filed and the trial exposed the fraud. Prior to notice of the fraud, the investors had no grounds upon which to demand payment. The need for each investor to bring suit on his or her own against American Savings was obviated by the state's suit, which sought relief for the investors. Most importantly, American Savings was protected from suit by the September 1977 injunction, which prohibited investors from filing suit unless they first obtained court permission to do so. Thus, if the investors had demanded payment, their means of seeking adjudication by the court could have been barred by the exercise of the trial court's discretion. Court control over the filing of additional suits worked to the advantage of American Savings and should not be used against the investors' interests.

█ American Savings protests the award of prejudgment interest on the total premiums before the premiums be offset by the mortality expenses incurred. We agree with the trial court. A.R.S. § 44–2001 states that a purchaser may recover "the consideration paid for the securities, with interest thereon, taxable court costs and reasonable attorneys' fees, less the amount of any income received by dividend or otherwise from ownership of the securities...." The order of these phrases is not without significance. Although the general rule may be that prejudgment interest is only to be paid on the net amount, *see, e.g., Homes and Son Construction Co. v. Bolo Corp.*, 22 Ariz.App. 303, 526 P.2d 1258 (1974), we cannot ignore the special wording of A.R.S. § 44–2001, the statutorily enacted remedy for voidable securities. The award of prejudgment interest by the trial court is affirmed.

## CONCLUSION

American Savings is not entitled to a modification of the plan of reorganization or an evidentiary hearing prior to re-scission on facts surrounding each individual's investment. The trial court erred in denying the rescission option to all investors by improperly applying the statute of limitations. In addition, the investors' payment or nonpayment of premiums does not affect their option to rescind. The plan's disallowance of all expenses other than mortality as fair costs of insurance is not clearly erroneous, and the award of prejudgment interest was well within the trial court's discretion.

Because American Savings is not the prevailing party on appeal, its request for attorney's fees on appeal and in the lower court is denied.

Affirmed in part, reversed in part and remanded with directions.

BROOKS and OGG, JJ., concur.

NOTE: The Honorable JACK L. OGG, a retired judge of a court of record, was authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Ariz. Const. art. VI, § 20.