IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DAVID SHOREY and MARY JANE SHOREY, husband and wife;
WESTCAP ENERGY, INC., an Arizona corporation dba Westcap Solar,
*Plaintiffs/Appellants,*

*v.*

ARIZONA CORPORATION COMMISSION, *Defendant/Appellee.*

No. 1 CA-CV 14-0471

FILED 9-17-2015

Appeal from the Superior Court in Maricopa County
No.  LC2013-000191-001
The Honorable Crane McClennen, Judge

**AFFIRMED**

COUNSEL

The Law Firm of Heurlin Sherlock, Tucson
By Bruce R. Heurlin, Catherine N. Hounfodji
*Counsel for Plaintiffs/Appellants*

Arizona Corporation Commission, Phoenix
By Phong Huynh
*Counsel for Defendant/Appellee*

**OPINION**

Judge Kenton D. Jones delivered the Opinion of the Court, in which
Presiding Judge Margaret H. Downie and Judge Jon W. Thompson joined.

**J O N E S**, Judge:

**¶1** Appellants challenge the superior court's order affirming a decision of the Arizona Corporation Commission (Commission) finding David Shorey and Westcap Energy, Inc. (Westcap) violated Arizona Revised Statutes (A.R.S.) sections 44-1841,[1] -1842, and -1991. We affirm the Commission's determination and hold the enforcement of those statutes to be both constitutional and not preempted by federal law.

## FACTS[2] AND PROCEDURAL HISTORY

**¶2** Westcap was incorporated in Arizona in 2008 for the primary purpose of installing solar panels. In 2009, Shorey, as Westcap's CEO, agreed with Litchfield Enterprises, Inc. (Litchfield), a Colorado corporation, to have Litchfield "consult" with Westcap to raise $1,000,000 through an offering of dividend-paying convertible preferred stock. Among the terms of the agreement, Litchfield agreed to identify potential investors and assist in preparing documents to present to them. In exchange, Litchfield would receive 10 percent of all monies received from the sale of securities as a "consulting fee." Neither Shorey nor Litchfield were registered to sell securities within or from Arizona.

**¶3** Litchfield and Westcap then engaged Intuition Capital (Intuition), a company from Spain also not registered to sell securities within or from Arizona, to solicit foreign investors for the Westcap offering. In exchange, Intuition would receive 65 percent of all investment monies received. With Intuition on board, Litchfield lowered its own commission rate to 7.5 percent. Thus, 72.5 percent of all Westcap security investments were contractually committed to the payment of commissions, leaving only 27.5 percent available to Westcap to obtain a return for the investors.

---

[1]    Absent material changes from the relevant date, we cite a statute's current version.

[2]    We view the facts in the light most favorable to upholding the Commission's decision. *See Hirsch v. Ariz. Corp. Comm'n*, 237 Ariz. 456, 458 n.2, ¶ 1 (App. 2015) (citing *Eaton v. Ariz. Health Care Cost Containment Sys.*, 206 Ariz. 430, 431, ¶ 2 (App. 2003), and *State v. Barber*, 133 Ariz. 572, 578 (App. 1982)).

¶4            Pursuant to their agreement, Litchfield and Westcap created a subscription agreement and private placement memorandum to present to potential investors.  The private placement memorandum reserved the right to pay commissions and finders' fees as needed,  specifically stating:

> The Company . . . reserves the right to pay commissions to registered brokers or dealers registered with the National Association of Securities Dealers ("NASD") in connection with the sale of the Shares in which case the proceeds to the Company will be reduced.  The Company may also pay finders' fees for introduction to persons or entities that purchase Preferred Stock in this Offering.  The amount of any commissions or finders' fees will be within the range of amounts normally paid in similar situations, in which case, the proceeds to the Company will be reduced.

The documents did not specify the amount or percentage of the investment that would actually be paid in commissions or finders' fees. And according to Shorey, the stock offering was never available to U.S. investors, but instead exclusively targeted foreign investors pursuant to Regulation S of the Securities Act of 1933, 15 U.S.C. § 77.[3]

¶5            In March 2010, Intuition began soliciting investors in Europe.  When Intuition found an interested investor, it notified Shorey. Shorey then sent documents detailing the proposed transaction to the potential investor by regular mail, email, or Federal Express.   The documents instructed the investor to sign and return all documents to Shorey by email or facsimile and to send money via wire transfer to a bank account in Tucson, Arizona under the name "Westcap Energy, Inc., David Shorey, CEO."   When an investor completed the transaction, Shorey immediately transferred 72.5 percent of the funds to Litchfield and Intuition in accordance with their prior agreements.

¶6            By August 2010, twenty-four investors had contributed a total of $388,570, of which $281,714 was immediately paid to Litchfield and Intuition.  On August 31, 2010, the securities sold were converted into shares of a Nevada corporation, and the offering resumed in Nevada.

---

[3]      Regulation S provides a safe harbor from the federal registration requirements for offers and sales of securities occurring outside the United States.  *See* 17 C.F.R. §§ 230.901-905 (2014); *see, e.g., Zacharias v. SEC*, 569 F.3d 458, 465 (D.C. Cir. 2009).

¶7          In March 2011, the Commission's Securities Division initiated administrative proceedings against Appellants alleging violations of A.R.S. §§ 44-1841 (prohibiting the sale of unregistered securities), -1842 (prohibiting the sale of securities by unregistered dealers and salesmen), and -1991 (prohibiting fraud in the sale of securities).

¶8          In March 2013, following an evidentiary hearing, the Commission found Westcap and Shorey offered and sold unregistered securities within or from Arizona in violation of A.R.S. § 44-1841, offered and sold securities from Arizona without being registered as dealers or salesmen in violation of A.R.S. § 44-1842, and made untrue statements and omitted material facts during securities transactions in violation of A.R.S. § 44-1991.  The Commission ordered Appellants to offer to rescind the $388,570 of stock sold to the twenty-four investors and held Appellants jointly and severally liable for all monies owed.[4]  The Commission also ordered Appellants to pay $10,000 in administrative penalties to the State of Arizona.  Westcap and Shorey were ordered to cease and desist from future violations of A.R.S. §§ 44-1841, -1842, and -1991.

¶9          Appellants timely appealed the Commission's decision to the superior court, and the court affirmed.  A notice of appeal to this Court was timely filed.  We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), -913, and -2101(A)(1).

**DISCUSSION**

¶10          Appellants do not contest the Commission's conclusion that Westcap and Shorey offered and sold unregistered securities, nor do they claim either Westcap or Shorey was registered to offer or sell securities within or from Arizona.  Instead, Appellants argue: (1) A.R.S. §§ 44-1841, -1842, and -1991 do not apply to the Westcap securities offering because, they contend, neither Westcap nor Shorey actually sold the securities, the sales did not occur within or from Arizona, and the sales were not fraudulent; (2) even if the conduct of Westcap and Shorey is proscribed by

---

[4]          Pursuant to Arizona Administrative Code (A.A.C.) R14-4-308, the Commission may order parties liable for violations of the Arizona Securities Act to make a rescission offer to investors.  The offer affords investors the opportunity to sell back their securities for "cash equal to the fair market value of the consideration paid . . . with . . . [i]nterest at a rate pursuant to A.R.S. § 44-1201."  A.A.C. R14-4-308.

4

these statutes, the applicable provisions are preempted by federal law regulating securities sales outside the United States; and (3) application of these statutes to the Westcap offering imposes an unconstitutional burden on interstate commerce.

**¶11**        On appeal from the judgment of the superior court, we determine whether the underlying administrative decision of the Commission "was illegal, arbitrary, capricious, or involved an abuse of discretion." *Eaton*, 206 Ariz. at 432, ¶ 7 (citing *Samaritan Health Servs. v. Ariz. Health Care Cost Containment Sys.*, 178 Ariz. 534, 537 (App. 1994)). Each of Appellants' arguments presents a question of law, which we review *de novo*. *Paczosa v. Cartwright Elementary Sch. Dist. No. 83*, 222 Ariz. 73, 77, ¶ 14 (App. 2009) ("On appeal, we review *de novo* the court's application of law to th[e] facts."); *Hutto v. Francisco*, 210 Ariz. 88, 90, ¶ 7 (App. 2005) ("We review federal preemption issues *de novo*."); *Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 557, ¶ 7 (App. 2002) ("We apply our independent judgment . . . to questions of law, including . . . constitutional claims.").

## I.        Application of A.R.S. §§ 44-1841, -1842, and -1991

**¶12**        The Arizona Securities Act (ASA), A.R.S. §§ 44-1801 through -2055, constitutes Arizona's "blue-sky laws." *Jennings v. Woods*, 194 Ariz. 314, 323, ¶ 40 (1999). Blue-sky laws "are designed to protect the public from fraud and deceit arising in [securities] transactions."[5] *State v. Baumann*, 125 Ariz. 404, 411 (1980). Appellants first argue Westcap and Shorey did not engage in prohibited conduct under the ASA because they

---

[5]        Although it is clear that blue-sky laws are aimed at ridding the market of overly speculative and fraudulent securities transactions, there is some disagreement about the origin of the term. In *SEC v. Edwards*, the U.S. Supreme Court asserted blue-sky laws were so named because "they were 'aimed at promoters who would sell building lots in the blue sky in fee simple.'" 540 U.S. 389, 394 (2004) (quoting 1 L. Loss & J. Seligman, *Securities Regulation*, at 36 (3d ed. 1998)). Much older Supreme Court authority, however, asserts the name derived from "the evil at which [the law] is aimed; . . . speculative schemes which have no more basis than so many feet of blue sky; or . . . to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines, and other like fraudulent exploitations." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal quotations omitted).

did not sell the securities, the sales did not occur within or from Arizona, and the sales were not fraudulent. We disagree.

### A. Westcap and Shorey Were Unregistered Salespersons Who Sold Unregistered Securities Within or From Arizona.

¶13 Under the ASA, "[i]t is unlawful to sell or offer for sale within or from this state any securities unless the securities have been registered . . . or are federally covered securities."[6] A.R.S. § 44-1841. Appellants do not assert Westcap securities were "federal covered securities" but argue instead that because the offering was made to investors through Intuition, it was not made within or from Arizona. This contention is unpersuasive for two reasons.

¶14 First, viewing the evidence in the light most favorable to upholding the Commission's decision, *Hirsch*, 237 Ariz. at 458 n.2, ¶ 1 (citation omitted), we find the offering was not made by Intuition; rather, the offering was created, offered, and sold by Westcap. Although Intuition sought out potential investors for Westcap, consistent with the offering, only Westcap had the authority to close the transaction. Intuition was therefore nothing more than a "go-between," or intermediary, facilitating sales that ultimately occurred between Westcap and its investors.

¶15 Second, the sale of securities to persons outside of Arizona does not require a finding that the sale, itself, was not made within or from Arizona. *See Ariz. Corp. Comm'n v. Media Prods., Inc.*, 158 Ariz. 463, 465-67 (App. 1988). In *Media Products*, the Commission brought an action against a Delaware corporation to enjoin the sale of unregistered

---

[6] "'Federal covered security' means any security described as a covered security in § 18 of the securities act of 1933." A.R.S. § 44-1801(12). Although Appellants assert Westcap securities were sold under Regulation S of federal law, Regulation S securities are not included in the Security Act's definition of "covered securities." *See* 15 U.S.C. § 77r(b)(4); *see also* 17 C.F.R. § 230.901, Preliminary Note 4 ("Nothing in these rules obviates the need to comply with any applicable state law relating to the offer and sale of securities."). Appellants argue Westcap securities were exempt from federal and state regulation requirements under Regulation S, but because Regulation S securities are not "covered securities," the Westcap securities offering is subject to the ASA's registration requirements.

securities, alleging the sale would be made within or from Arizona in violation of A.R.S. § 44-1841. *Id.* at 464. The corporation asserted that, because it was incorporated in Delaware and did not offer the securities in Arizona or to Arizona residents, the sales were not made within or from the State of Arizona. *Id.* Therefore, it contended, the registration requirement of A.R.S. § 44-1841 was inapplicable to its offering. *Id.* at 464-65. This Court found, however, the corporation's principal place of business and base of operations were in Arizona, its officers and directors operated from and resided in Arizona, the stock certificates were prepared and issued by an agent in Arizona, the board meetings were held in Arizona, the escrow agreement designated an Arizona bank as the escrow agent, and the sale documents identified an Arizona address as the place for notices to be provided. *Id.* at 465-66. Noting the corporation's Arizona activities were "more than ministerial," this Court concluded the securities were sold within or from Arizona under A.R.S. § 44-1841. *Id.* at 466-67.[7]

¶16 The Arizona Attorney General addressed this issue more than sixty years ago, concluding "the words 'within or from this state' in A.R.S. § 44-1841 encompass the sale or offer for sale of unregistered securities within this state, and also the offering and selling of unregistered securities to purchasers without the state through a base of operations within this state." Op. Ariz. Att'y Gen. 56-140, at 2-3 (1956). The Attorney General added that the words "within or from" do not "require the registration of an issue of stock by a corporation organized under the laws of Arizona merely because it is an Arizona corporation." *Id.* at 3. However, if the corporation's activities within Arizona are more than ministerial, the corporation is subject to the ASA's registration requirements, even if the corporation is only selling securities to non-Arizonans. *Media Prods.*, 158 Ariz. at 466-67; *Chrysler Capital Corp. v. Century Power Corp.*, 800 F. Supp. 1189, 1193 (S.D.N.Y. 1992) (applying Arizona law).

---

[7] This Court ultimately held the application of A.R.S. § 44-1841 to the corporation was unconstitutional because it would have created a direct burden on interstate commerce. *Id.* at 469. Because the corporation sold securities registered in other states and with the Securities Exchange Commission (SEC) to non-Arizonans, we identified no Arizona interest justifying further regulation of the sale. *Id.* This aspect of *Media Products* is discussed further in Part III.

¶17 Westcap's actions in Arizona were "more than ministerial." As in *Media Products*, Westcap's principal place of business and base of operations were established in Arizona, its officers and directors resided in and operated from Arizona, the board meetings were held in Arizona, and payments were wire transferred to an Arizona bank. In addition, Westcap was incorporated in Arizona; the various sale documents, including the subscription agreement and private placement memorandum, were distributed to potential investors from Shorey in Arizona; and the subscription agreement specified Arizona law would govern the transaction designating Tucson, Arizona as the appropriate forum for any future disagreement. Under these circumstances, the transactions are overwhelmingly connected to Arizona, and we find no error in the conclusion that Westcap and Shorey sold unregistered securities within or from Arizona under A.R.S. § 44-1841.

¶18 Similar language in A.R.S. § 44-1842 encompasses Westcap's conduct. "It is unlawful for any dealer to sell or purchase or offer to sell or buy any securities, or for any salesman to sell or offer for sale any securities within or from this state unless the dealer or salesman is registered as such pursuant to the [ASA]." A.R.S. § 44-1842. Again, Westcap and Shorey acknowledge they were unregistered salesmen of the securities. Having already concluded the sales took place within or from Arizona, we find no error in the determination Westcap and Shorey violated A.R.S. § 44-1842.

   **B. Westcap and Shorey Made Misrepresentations to Investors and Omitted Material Facts in Connection with the Sale of Westcap Securities.**

¶19 The ASA's anti-fraud statute states, in relevant part:

> It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities . . . directly or indirectly to do any of the following:
>
> . . .
>
> Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

A.R.S. § 44-1991(A)(2). Appellants contend they did not violate A.R.S. § 44-1991(A)(2) because information regarding the specific amount of commissions paid to Intuition and Litchfield was not material. We disagree.

**¶20**        "The requirement of materiality is satisfied by 'a showing of substantial likelihood that, under all the circumstances, the misstated or omitted fact would have assumed actual significance in the deliberations of a *reasonable* buyer.'" *Hirsch*, 237 Ariz. at 922, ¶ 27 (citing *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 553 (App. 1986)) (internal quotations omitted). Although specific disclosures regarding commissions and finders' fees are not *per se* required, omitted information that would have significance in a reasonable buyer's deliberations is misleading and thus violates A.R.S. § 44-1991(A)(2).

**¶21**        Here, the Commission found Westcap's payment of 72.5 percent of invested funds to commissions and finders' fees would have been a substantial factor in a reasonable buyer's decision to invest. At least one other court has acknowledged that a 30 percent commission figure is, "as a matter of law, one that most reasonable investors would deem material in determining whether to invest," and "failure to disclose this sum misrepresents the investor's potential profit." *SEC v. Levine*, 671 F. Supp. 2d 14, 30 (D.D.C. 2009) (internal quotation and citation omitted). We therefore agree with the Commission's conclusion that a 72.5 percent commission figure is material and should have been disclosed to potential Westcap investors. To be reasonably informed, the investor would need to know that nearly three-quarters of the total investment amount is unavailable to realize any return.

**¶22**        The private placement memorandum presented to investors also contains overt misrepresentations and misleading statements. For example, the "Use of Proceeds" section of the memorandum breaks down how Westcap would use the invested funds, specifically indicating that, of the $1,000,000 offering, only $100,000, or 10 percent, would be set aside for "offering expenses" — the expense category that investors could reasonably believe includes commissions.[8] In actuality, the percentage of

---

[8]        The "Use of Proceeds" indicates the rest of the funds would be used as follows: $225,000 for local advertising and branding of name; $36,000 for staff development and training expenses; $15,000 for warehouse and office equipment; $90,000 for acquisition of service and installation equipment and vehicles; $357,000 for funding growth in

investment money siphoned off to "offering expenses" was substantially higher. This misrepresentation is material. Any reasonable potential buyer presented with the truth would carefully consider the likelihood of Westcap's ability to obtain the projected return where 72.5 percent of the total invested funds were spent on commissions and finders' fees.

¶23 Appellants lastly argue the Commission did not present any evidence of actual harm to investors or what a normal commission and finders' fee would be for an overseas securities transaction. However, the Commission had no duty to do so; the Commission need only show Westcap's statements and omissions were objectively material and misleading — a feat which it has clearly accomplished. *Trimble*, 152 Ariz. at 553 ("[D]efendants have an affirmative duty not to mislead potential investors. This requirement not only removes the burden of investigation from an investor, but places a heavy burden upon the offeror not to mislead potential investors in any way.") (citation omitted).

¶24 Appellants have not "show[n] by clear and satisfactory evidence that [the Commission's decision] is unreasonable or unlawful." *Reliable Transp.*, 86 Ariz. at 370-71 (quoting A.R.S. § 40-254(E)). We therefore find no error in the conclusion that Westcap violated A.R.S. § 44-1991(A)(2).[9]

## II. Federal Preemption of A.R.S. §§ 44-1841, -1842, or -1991

¶25 Appellants argue Arizona's regulation of securities sold exclusively to foreign investors is preempted by SEC Regulation S. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law may preempt state law through express preemption, field preemption, or conflict preemption. *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003) (citing *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987), and *Pac. Gas & Elec. Co. v.*

---

accounts receivable and working capital; $125,000 for funding growth in inventories; $40,000 for patents and engineering expenses; and $12,000 for security deposits.

[9] Although we hold a 72.5 percent commission payment was a material fact that should have been disclosed in this case, we need not determine what might constitute a reasonable commission for purposes of A.R.S. § 44-1991. "This Court's review is limited to whether there is substantial evidence in the record to support the finding of the superior court." *Pac. Motor Trucking*, 116 Ariz. at 467.

*Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)). We address each type of preemption in turn and, finding that none apply, conclude A.R.S. §§ 44-1841, -1842, and -1991 are not preempted by federal law.

### A.   Express Preemption

**¶26**　　　Express preemption exists if Congress has "explicitly stated in [a federal] statute's language" that a state law is preempted. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 56-57 (1990)). Appellants, however, do not identify any congressional command within any provision of federal securities law which explicitly prohibits Arizona from regulating the sale of securities, and our search reveals none.

**¶27**　　　To the contrary, Congress recognized the validity of blue-sky laws governing intrastate transactions by enacting 15 U.S.C. § 78bb(a), "a provision 'designed to save state blue-sky laws from pre-emption.'" *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (quoting *Leroy v. Great W. United Corp.*, 443 U.S. 173, 182 n.13 (1979)). Thus, the ASA is expressly permitted by congressional decree so long as its application is limited to securities transactions occurring within or from Arizona. *See id.*; 15 U.S.C. § 78bb(a) ("Except as otherwise specifically provided in this chapter, nothing in [Title 15, Chapter 2B of the United States Code] shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations under this chapter."). Clearly, federal securities laws are intended to co-exist with state securities laws, and for these reasons, we find Appellants have not shown the ASA is expressly preempted.

### B.   Field Preemption

**¶28**　　　For the same reasons, Appellants have not shown field preemption of the ASA. Field preemption exists "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Ting*, 319 F.3d at 1136 (citing *In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1045-46 (9th Cir. 2001)) (internal quotation omitted). Although federal securities law is quite comprehensive, Appellants do not provide any indication that Congress left no room for supplementary state

regulation. Indeed, as addressed above, federal law expressly permits states to enact and enforce their own securities laws. *See supra* ¶ 27.

### C. Conflict Preemption

**¶29** Finally, conflict preemption may exist when application of state law conflicts with federal law, but only (1) "where compliance with both federal and state regulations is a physical impossibility," or (2) where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 78-79 (1987) (quoting *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 158 (1978)) (internal quotations omitted).

**¶30** Appellants have not identified any impossibility in complying with the requirements of both the ASA and federal securities laws, and we likewise find no impossibility exists. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 583 (9th Cir. 1983) (finding no conflict preemption where, although "state standards are more stringent than the federal standards, it is possible to comply with both").

**¶31** Appellants do argue the ASA is an obstacle to the accomplishment and execution of Regulation S, which they contend unequivocally exempts its overseas activity from registration and disclosure laws. This, however, does not demonstrate how the ASA stands as an obstacle to a congressional objective or purpose; even if Westcap's offering were a valid Regulation S security offering — a determination we need not make for purposes of this appeal — the regulation only exempts security sales from *federal* registration and disclosure laws, not *state* registration and disclosure laws. *See* 17 C.F.R. § 230.901 (exempting the sale of securities outside the United States from the federal registration requirements of 15 U.S.C. § 77e).

**¶32** Westcap's argument is further undercut by Preliminary Note 4 of the rules governing Regulation S security offerings, which states: "Nothing in these rules obviates the need to comply with any applicable state law relating to the offer and sale of securities." 17 C.F.R. § 230.901, Preliminary Note 4.[10] Moreover, the Ninth Circuit Court of Appeals

---

[10] Despite comprehensive revisions to Regulation S in 1997 and 1998, Congress did not change the text of Preliminary Note 4. *See* Offshore Offers and Sales, 63 Fed. Reg. 9632-01, 9642 (Feb. 25, 1998); Offshore Press Conferences, Meetings with Company Representatives Conducted

rejected a similar argument that state regulatory efforts aimed at reviewing the merits of a securities offering "stand as obstacles to effective implementation of the federal regulatory scheme." *N. Star Int'l*, 720 F.2d at 582-83.

**¶33** It is clear Congress did not intend Regulation S to exempt the sale of securities from applicable state securities laws. We therefore find A.R.S. §§ 44-1841, -1842, and -1991 do not conflict with federal securities laws and are thus not preempted. Having concluded these ASA provisions are applicable, we next address the constitutionality of applying these provisions to the Westcap securities offering.

### III. Constitutionality of A.R.S. §§ 44-1841, -1842, and -1991 as Applied

**¶34** Appellants argue that applying the ASA under the circumstances presented violates the Commerce Clause of the U.S. Constitution. That the Commerce Clause limits a state's power to regulate interstate commerce is a truism. U.S. Const. art. I, § 8, cl. 3 (reserving to Congress the right "[t]o regulate Commerce . . . among the several States"); *Edgar*, 457 U.S. at 640. However, not every state act that impacts interstate commerce is invalid. *Edgar*, 457 U.S. at 641. A state statute must be upheld unless it directly burdens interstate commerce or imposes an incidental burden on interstate commerce that outweighs the state's legitimate local interest. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Supreme Court has repeatedly upheld the constitutionality of blue-sky laws against Commerce Clause challenges, finding the state's purpose in enacting such legislation legitimate and the burden incidental. *Edgar*, 457 U.S. at 641.

**¶35** Appellants nonetheless argue A.R.S. §§ 44-1841, -1842, and -1991 directly burden interstate commerce. In the alternative, Appellants contend Arizona has no legitimate interest in applying these ASA provisions to securities sold to foreign investors, and therefore, even an incidental burden is excessive. We disagree.

---

Offshore and Press-Related Materials Released Offshore, 62 Fed. Reg. 53948-03, 53954 (Oct. 17, 1997).

**A. The ASA's Anti-Fraud Provisions Do Not, as a Matter of Law, Impose an Impermissible Burden on Interstate Commerce.**

¶36 Appellants do not present a colorable argument that A.R.S. § 44-1991, designed to prevent fraud in the offer and sale of securities, imposes a direct burden on interstate commerce. The statute imposes no additional requirements on the sale of securities and does not impede interstate transactions. *See Chrysler*, 800 F. Supp. at 1195. To the contrary, we agree with the U.S. District Court for the Southern District of New York, which, in reviewing the constitutionality of A.R.S. § 44-1991, held, "such legislation *facilitates* commerce far more than it can even be argued to 'burden' in any sense . . . because it provides a measure of assurance that commerce will be honestly transacted." *Id.*

¶37 Furthermore, Congress expressly preserved state authority to regulate against fraud. *See* 15 U.S.C. 77r(c)(1) (stating "the securities commission (or any agency or office performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions, in connection with securities or securities transactions . . . with respect to (i) fraud or deceit"). Under this federal directive, the ASA's provisions forbidding fraudulent activity within or from Arizona are expressly allowed and cannot be found burdensome under a Commerce Clause analysis. Therefore, we hold, as a matter of law, that A.R.S. § 44-1991 imposes no impermissible burden on interstate commerce and does not violate the Commerce Clause.

**B. The Registration Requirements of A.R.S. §§ 44-1841 and -1842, as Applied, Do Not Directly Burden Interstate Commerce, and Any Incidental Burden is Outweighed by Arizona's Legitimate Interest in Protecting its Business Reputation.**

¶38 Appellants rely on *Media Products* in advancing their argument that the registration requirements of A.R.S. §§ 44-1841 and -1842 improperly burden interstate commerce. In *Media Products*, this Court considered a Delaware corporation's sale of securities registered with other states and the SEC to non-Arizonans. 158 Ariz. at 464-65. Under those facts, this Court held Arizona did not have a legitimate interest in protecting nonresident shareholders whose home states had already determined the offerings met their state standards, and that, although Arizona's business reputation is a legitimate local public interest, the corporation's security sales did not place Arizona's business reputation at

stake. *Id.* at 468-69 (citing *CTS Corp.*, 481 U.S. at 1651-52, and *Edgar*, 457 U.S. at 644). Additionally, because A.R.S. § 44-1841 was not "effectuat[ing] a legitimate local public interest," we held it constituted a direct and unconstitutional burden on interstate commerce. *Id.* (quoting *Edgar*, 457 U.S. at 640).

**¶39** We find important distinctions between *Media Products* and the present case. Although the corporation in *Media Products* was selling securities within or from Arizona, it was not an Arizona corporation, and its securities were registered in other states and with the SEC. *Id.* at 469. The out-of-state purchasers' interests were adequately addressed by the appropriate agencies in their home states and the SEC. *See id.* Moreover, the corporation advised purchasers it was based in Delaware and that the offerings were not approved by the Commission, effectively eliminating any legitimate concern that, "if the sale was unfair, blame could be placed on Arizona, tarnishing its reputation." *Id.* at 470.

**¶40** This case, however, presents an entirely different scenario. Although Arizona may not have a legitimate interest in protecting nonresident shareholders, it does have "an important interest in keeping itself free of enterprises which offer questionable investment opportunities." *Id.* at 469 ("A state has an interest in seeing that its territory is not used as a base of operations to conduct illegal sales in other states. Thus, the host state has an interest in protecting its reputation as not being a center for illegal or questionable securities activity.") (quotation and citation omitted); *see also State ex rel. Corbin v. Goodrich*, 151 Ariz. 118, 122 (App. 1986) ("Arizona has a legitimate interest in regulating the conduct of Arizona residents engaged in the offer and sale of securities even though those ultimately victimized may not be Arizona residents.") (citing *State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 597 (1983), and *Ariz. State Real Estate Dep't v. Am. Standard Gas & Oil Leasing Serv., Inc.*, 119 Ariz. 183, 186-87 (App. 1978)). Unlike in *Media Products*, Arizona's interest in its business reputation is at stake here, where Westcap was incorporated in Arizona, actively operated from the state, and sold securities not registered anywhere. *See Goodrich*, 151 Ariz. at 122 (approving state exercise of police power "to regulate the conduct of persons residing in Arizona and using this state as a base for securities operations").

**¶41** Furthermore, there is no evidence these provisions of the ASA apply more or less stringently to, or unfairly target, interstate commerce. *See Pike*, 397 U.S. at 142 (noting statute affecting interstate commerce must be applied "even-handedly"). Rather, the ASA consistently addresses unlawful conduct occurring within or from

Arizona by an Arizona corporation, something it is clearly entitled to do. *Goodrich*, 151 Ariz. at 122; *see also Edgar*, 457 U.S. at 641 (noting blue-sky laws that regulate transactions occurring within the regulating state have traditionally been upheld against Commerce Clause challenges). On these principles, we find no direct burden on interstate commerce by applying A.R.S. §§ 44-1841 and -1842 in this case.

¶42 Although A.R.S. §§ 44-1841 and -1842 impose an incidental burden on the offer or sale of securities by requiring registration, Appellants do not illustrate how applying these ASA provisions in this case excessively burdens interstate commerce in relation to Arizona's legitimate interest in protecting its business reputation. *See Pike*, 397 U.S. at 142 (establishing a balancing test to determine whether a state statute excessively burdens interstate commerce in relation to the local benefits) (citing *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443 (1960)).

¶43 Westcap's security offering clearly implicates Arizona's business reputation, and the registration requirements of A.R.S. §§ 44-1841 and -1842 are no more burdensome on interstate securities transactions than on a securities transaction with Arizona residents. To hold that Arizona must apply different standards when an Arizona corporation sells securities to an Arizona resident than when it sells to a nonresident would be absurd. Arizona's interest in regulating the conduct of Arizona corporations selling unregistered, speculative, or misleading securities within or from Arizona — regardless of the purchaser's place of residence — far exceeds any incidental burden imposed by the registration requirements.

¶44 Appellants also suggest that, because this application of the ASA burdens foreign commerce, as opposed to interstate commerce, it warrants greater scrutiny under *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 96 (1984) (noting "'Commerce Clause scrutiny may well be more rigorous when a restraint on foreign commerce is alleged'") (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 438 n.9 (1980)). Westcap has not, however, identified any foreign policy issues or federal directives implicated by applying these ASA provisions to an Arizona corporation that would run afoul of the Commerce Clause. *See Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983); *Piazza's Seafood World, L.L.C. v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006) (noting the Commerce Clause prohibits even nondiscriminatory state regulations if they "(1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in

regulating commercial affairs with foreign states") (quoting *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1022 (5th Cir. 1989)). We therefore hold the application of A.R.S. §§ 44-1841 and -1842 to the offer or sale of securities made within or from Arizona to foreign investors does not improperly interfere with interstate or foreign commerce.

**CONCLUSION**

¶**45**     The superior court's order upholding the Commission's decision is affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: ama